LISA KOBIALKA (State Bar No. 191404)
CHRISTINA M. FINN (State Bar No. 247838)
Brown Rudnick LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Telephone: (669) 469-1800
Facsimile: (669) 469-1801
Email: lisa.kobialka@brownrudnick.com
Email: christina.finn@brownrudnick.com

AARON M. FRANKEL (*pro hac vice* to be filed)
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
Email: aaron.frankel@brownrudnick.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| SPRINTRAY, INC.,<br><br>Plaintiff,<br>v.<br><br>SHINING 3D TECH CO. LTD., and SHINING 3D TECHNOLOGY, INC.,<br><br>Defendants. | Case No. 5:26-cv-06026-BLF<br><br>**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT, FALSE ADVERTISING, AND UNFAIR COMPETITION

Plaintiff SprintRay, Inc. ("SprintRay") files this First Amended Complaint for Patent Infringement, False Advertising, Unfair Competition, and Demand for Jury Trial against Shining 3D Tech Co. Ltd. and Shining 3D Technology, Inc. (collectively, "Defendants" or "Shining 3D") and alleges as follows:

SprintRay developed and patented novel technology for advanced, high-quality 3D printing. The United States Patent and Trademark Office ("USPTO") issued U.S. Patent Nos. 7,783,371, 7,894,921, 8,126,580, 8,815,143, 10,894,355, 11,548,224, 11,633,910, 12,576,588, and 12,583,180. Exs. 1-2, 4-5, 24-28 (the "Asserted Patents"). SprintRay filed this suit to protect its valuable intellectual property from Shining 3D's ongoing infringement.

SprintRay has also invested substantial resources to ensure that its products comply with applicable regulatory requirements, including the Federal Communications Commission's equipment-authorization rules for radio-frequency devices. Shining 3D, by contrast, falsely represented to potential customers that its Ceramix Nano was FCC-authorized and compliant with Part 15 of the FCC Rules before obtaining the required FCC equipment authorization, unfairly gaining a commercial advantage and causing injury to SprintRay. SprintRay brings this action to remedy Shining 3D's false advertising and unfair competition.

## THE PARTIES

1. SprintRay is a California corporation with its principal place of business at 2710 Media Center Drive, Suite 100A, Los Angeles, CA 90065. SprintRay was founded in 2014. SprintRay builds and supplies end-to-end 3D printing products and ecosystems, including to dental professionals, using technologies that are both cutting-edge and user-friendly. SprintRay offers a range of 3D printing solutions, including its SprintRay Pro 55S, Pro 95S, Pro 2, and Midas 3D printers.

2. Shining 3D Tech Co. Ltd. is a corporation organized and existing under the laws of China, with its principal place of business at No. 1398, Xiangbin Road, Wenyan, Xiaoshan, Hangzhou, Zhejiang, China, 311258. Shining 3D Tech Co. Ltd. designs and manufactures stereolithography

("SLA") and digital light processing ("DLP") 3D printers, related hardware components, materials, and software. Shining 3D Tech Co. Ltd. markets and offers these products for sale in the United States through its website and through authorized resellers and distributors and introduces these products into the stream of commerce with the knowledge and expectation that they will be sold in this District and throughout the United States.

3. Shining 3D Technology, Inc. is a corporation organized and existing under the laws of California, with its principal place of business at 2450 Alvarado St., Bldg 7, San Leandro, California 94577. Upon information and belief, Shining 3D Technology, Inc. imports, distributes, markets, and sells Shining 3D Technology, Inc.'s printers and related products throughout the United States, introducing them into the stream of commerce knowing that they would be sold in this District and elsewhere in the United States.

4. On information and belief, Defendants Shining 3D Tech Co. Ltd and Shining 3D Technology, Inc. are related entities that work in concert to design, manufacture, import, distribute, offer for sale, and sell the infringing products.

## JURISDICTION AND VENUE

5. Jurisdiction and venue for this action are proper in this District.

6. This action for patent infringement arises under the patent laws of the United States, 35 U.S.C. § 101 *et seq*. This Court has original subject matter jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331 and 1338 because this is a civil action arising under the Patent Act and Section 43(a) of the Lanham Act.

7. This Court has subject-matter jurisdiction over Counts XX and XXI below pursuant to 28 U.S.C. §§ 1338(b) and 1367(a) because those claims arise from the same nucleus of operative facts as SprintRay's patent infringement and Lanham Act violations, and form part of the same case or controversy under Article III of the United States Constitution.

8. This Court has personal jurisdiction over Shining 3D Technology, Inc. because it is incorporated within this District.

9. Shining 3D Tech Co. Ltd. is subject to this Court's personal jurisdiction consistent with the principles of due process and the California Long-Arm Statute, including for the reasons set forth below. Cal. Code Civ. Proc. § 410.10.

10. This Court further has personal jurisdiction over Defendants because Defendants regularly and continuously, either directly or through subsidiaries or intermediaries, conduct business in this District and have infringed, unfairly competed, and falsely advertised, and continue to do so, in this District. In addition, the Court has personal jurisdiction over Defendants because they have established minimum contacts with this District and the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. For example, Defendants maintain a United States office in San Leandro, California and market and sell products alleged to be infringing in this Complaint throughout the United States, including in this District, through their website and network of authorized resellers and distributors. On information and belief, Defendants have derived substantial revenues from their infringing acts occurring in this District and throughout the United States, and from the false and misleading advertising and promotional activities alleged herein.

11. Venue is proper as to Shining 3D Technology, Inc., for Counts I-XVIII pursuant to 28 U.S.C. § 1400(b), because it resides in this District.

12. Venue is proper as to Shining 3D Technology, Inc., for Counts XIX, XX, and XXI pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because it resides in this District and because a substantial part of the events, acts, omissions, and injuries giving rise to those claims occurred in this District.

13. Venue is proper as to Shining 3D Tech Co. Ltd., a Chinese corporation, for all Counts because suits against foreign entities are proper in any judicial district under 28 U.S.C. § 1391(c)(3).

## SPRINTRAY'S ASSERTED PATENTS

14. On August 24, 2010, the USPTO issued U.S. Patent No. 7,783,371 (the "'371 Patent"), entitled "Device and Method for Producing a Three-Dimensional Object by Means of Mask Exposure." The '371 Patent lists Hendrik John, Volker Schillen, and Ali El-Siblani as its inventors. Attached hereto as Exhibit 24 is a true and correct copy of the '371 Patent.

15. All rights, title, and interest in the ’371 Patent have been assigned to SprintRay, which is the sole owner of the ’371 Patent.

16. The ’371 Patent claims improvements to devices used for three-dimensional printing. Specifically, it claims a device for producing a three-dimensional object from a solidifiable material. This device utilizes electromagnetic radiation by means of energy input via an imaging unit comprising a predetermined number of discrete imaging elements (pixels). The device further comprises a computer unit, an integrated circuit and/or software implementation which improves the device’s ability to print 3D objects by varying the intensity value of the electromagnetic radiation projected at the corresponding surface location of each discrete imaging element using a specific gray value and/or color value calculated by measuring the light intensity at selected locations of the exposed surface of the solidifiable material. This specific solution addresses a technological problem with a technological solution and is not based on technology that was conventional, routine, or well known at the time of the invention.

17. On February 22, 2011, the USPTO issued U.S. Patent No. 7,894,921 (the “’921 Patent”), entitled “Device and Method for Producing a Three-Dimensional Object by Means of Mask Exposure.” The ’921 Patent lists Hendrik John, Volker Schillen, and Ali El-Siblani as its inventors. Attached hereto as Exhibit 25 is a true and correct copy of the ’921 Patent.

18. All rights, title, and interest in the ’921 Patent have been assigned to SprintRay, which is the sole owner of the ’921 Patent.

19. The ’921 Patent claims improved devices and methods for producing three-dimensional objects. Specifically, it claims devices and methods for producing a three-dimensional object by solidifying a solidifiable material including by varying the energy input related to a specific cross-sectional area of the three-dimensional object by controlling exposure of electromagnetic radiation produced by an imaging unit. This exposure is controlled through the use of multiple successive raster masks or bitmaps, including via a computer unit, integrated circuit, or software implementation that controls exposure through the use of a first overall mask and a partial mask within the overall mask.

This specific solution addresses a technological problem with a technological solution and is not based on technology that was conventional, routine, or well known at the time of the invention.

20. On February 28, 2012, the USPTO issued U.S. Patent No. 8,126,580 (the "'580 Patent"), entitled "Device and Method for Producing a Three-Dimensional Object by Means of Mask Exposure." The '580 Patent lists Ali El-Siblani, Volker Schillen, and Hendrik John as its inventors. Attached hereto as Exhibit 26 is a true and correct copy of the '580 Patent.

21. All rights, title, and interest in the '580 Patent have been assigned to SprintRay, which is the sole owner of the '580 Patent.

22. The '580 Patent claims an improved device for producing a three-dimensional object by solidification of a material solidifiable under the action of electromagnetic radiation. An imaging unit comprising a predetermined number of discrete imaging elements (pixels) provides the energy input to a corresponding location on the exposed surface of the solidifiable material. The device further comprises a computer unit, IC, and/or software implementation with the ability to adjust and/or control the energy input via a specific gray value and/or color value in a voxel matrix. The energy input is varied based on the value of the light intensity and a degree of overlap between the location on the exposed surface of the solidifiable material to which the energy input corresponds and a graphic depicting the three-dimensional object, thus improving print precision, resolution, fine adjustment and/or higher output homogeneity. This specific solution addresses a technological problem with a technological solution and is not based on technology that was conventional, routine, or well known at the time of the invention.

23. On August 26, 2014, the USPTO issued U.S. Patent No. 8,815,143 (the "'143 Patent"), entitled "Method for Producing a Three-Dimensional Object by Means of Mask Exposure." The '143 Patent lists Hendrik John, Volker Schillen, and Ali El-Siblani as its inventors. Attached hereto as Exhibit 27 is a true and correct copy of the '143 Patent.

24. All rights, title, and interest in the '143 Patent have been assigned to SprintRay, which is the sole owner of the '143 Patent.

25. The ’143 Patent claims improved methods for producing three-dimensional objects. Specifically, it claims methods for producing a three-dimensional object by solidifying a solidifiable material including by varying the energy input related to a specific cross-sectional area of the three-dimensional object by controlling exposure to that area. This exposure is controlled by supplying solidification energy to a portion of the solidifiable material corresponding to a cross-section of the three-dimensional object in accordance with a first bitmap mask and a second bitmap mask, wherein the second bitmap mask is a partial mask within the first bitmap mask. This specific solution addresses a technological problem with a technological solution and is not based on technology that was conventional, routine, or well known at the time of the invention.

26. The USPTO issued U.S. Patent No. 10,894,355 (the “’355 Patent”), entitled “Resin Solidification Substrate and Assembly,” on January 19, 2021. The ’355 Patent lists Ali El-Siblani and Alexandr Shkolnik as its inventors. Attached hereto as Exhibit 1 is a true and correct copy of the ’355 Patent.

27. All rights, title, and interest in the ’355 Patent have been assigned to SprintRay, which is the sole owner of the ’355 Patent.

28. The ’355 Patent claims a solidification substrate assembly used in additive manufacturing, comprising concrete physical components such as a solidification substrate, a rigid or semi-rigid support layer, a film layer positioned adjacent to that rigid layer, as well as peeling members to reduce separation forces. It solves a specific technological problem in 3D resin printing: the difficulty of reliably separating a newly solidified layer from the underlying substrate without introducing print failures, damage, or excessive peel forces. This specific solution addresses a technological problem with a technological solution and is not based on technology that was conventional, routine, or well known at the time of the invention.

29. The USPTO issued U.S. Patent No. 11,548,224 (the “’224 Patent”), entitled “Apparatus, system, and method for use in three-dimensional printing,” on January 10, 2023. The ’224 Patent lists Amir Mansouri, Huijian Tian, Jing Zhang, and Abdol Hossein Bassir as its inventors. Attached hereto as Exhibit 28 is a true and correct copy of the ’224 Patent.

30. All rights, title and interest in the ’224 Patent have been assigned to SprintRay, which is the sole owner of the ’224 Patent.

31. The ’224 Patent claims reservoir assemblies used in three-dimensional printing for building a 3D object. The claimed assemblies include a top frame configured to hold liquid printing material and a tensioned film positioned beneath the top frame, where the film may be air permeable, elastic, and micro-textured to improve its interaction with the liquid material. The patent also describes structural features that reduce bubble formation, improve optical clarity when the film contacts the liquid material, and enhance part surface quality during printing. The patent addresses a specific technological problem in 3D printing, namely reducing bubble formation and improving resin-interface performance in a manner that facilitates successful printing and improves the finish of fabricated parts. This specific solution addresses a technological problem with a technological solution and is not based on technology that was conventional, routine, or well known at the time of the invention.

32. The USPTO issued U.S. Patent No. 11,633,910 (the “’910 Patent”), entitled “Resin Solidification Substrate and Assembly,” on April 25, 2023. The ’910 Patent lists Ali El-Siblani and Alexandr Shkolnik as its inventors. Attached hereto as Exhibit 2 is a true and correct copy of the ’910 Patent.

33. All rights, title, and interest in the ’910 Patent have been assigned to SprintRay, which is the sole owner of the ’910 Patent.

34. The ’910 Patent claims multi-layered substrate systems used in additive manufacturing systems, particularly stereolithography based printers. The claimed assemblies include a multi-layer system comprising a film layer and rigid or semi-rigid solidification substrate in non-adhesive contact with each other, as well as separation-facilitating features that mitigate adhesion forces during the printing process such as peeling members. The patent addresses a specific technological problem in 3D printing, namely improving the separation of newly-formed layers of the 3D printed object from the solidification substrate without damaging the newly-printed 3D object or interfering with the printing process. This specific solution addresses a technological problem with a technological

solution and is not based on technology that was conventional, routine, or well known at the time of the invention.

35. The USPTO issued U.S. Patent No. 12,576,588 (the "'588 Patent"), entitled "Reservoir with Substrate Assembly for Reducing Separation Forces in Three-Dimensional Printing," on March 17, 2026. The '588 Patent lists Amir Mansouri, Huijian Tian, Hossein Bassir, Jing Zhang, and Shukun Ye as its inventors. Attached hereto as Exhibit 4 is a true and correct copy of the '588 Patent.

36. All rights, title, and interest in the '588 Patent have been assigned to SprintRay, which is the sole owner of the '588 Patent.

37. The '588 Patent claims reservoir assemblies used in additive manufacturing systems, particularly stereolithography, that employ multi-layer structures. These assemblies include a film configured to retain photosensitive material, along with one or more layers positioned below the film, such as permeable substrates or rigid transparent layers. The claimed configurations reduce separation forces between cured material and the reservoir during printing, thereby improving print reliability, accuracy, and cycle time. The patent addresses the technological problem of suction forces encountered during layer separation by proposing specific structural reservoir designs and material arrangements. This specific solution addresses a technological problem with a technological solution and is not based on technology that was conventional, routine, or well known at the time of the invention.

38. The USPTO issued U.S. Patent No. 12,583,180 (the "'180 Patent"), entitled "Reservoir Assembly for Enhancing a Surface Finish of a 3D-Printed Object," on March 24, 2026. The '180 Patent lists Amir Mansouri, Huijian Tian, Hossein Bassir, Jing Zhang, and Shukun Ye as its inventors. Attached hereto as Exhibit 5 is a true and correct copy of the '180 Patent.

39. All rights, title, and interest in the '180 Patent have been assigned to SprintRay, which is the sole owner of the '180 Patent.

40. The '180 Patent claims reservoir and substrate assemblies used in additive manufacturing systems, particularly stereolithography-based printers. The claimed assemblies include layered structures comprising a film for retaining photosensitive material and a semi-transparent

substrate positioned within the assembly. These configurations are designed to diffuse projected light during printing in order to reduce pixelation and aliasing artifacts and thereby enhance the surface finish of three-dimensional printed objects. The patent addresses a specific technological problem in 3D printing, namely achieving smoother and higher-quality surface finishes, by introducing particular layered substrate arrangements within the reservoir assembly to reduce pixelation. This specific solution addresses a technological problem with a technological solution and is not based on technology that was conventional, routine, or well known at the time of the invention.

41. SprintRay complies with the marking statute (35 U.S.C. § 287). SprintRay marks its patent-practicing 3D printers with a link to its website, identifying the patents each printer practices, so that SprintRay's patents are identified to anyone who examines its products or visits its website. Exhibit 6 (https://sprintray.com/patents/). To the extent Shining 3D has done either, Shining 3D learned of SprintRay's patents directly.

## SHINING 3D'S INFRINGING PRODUCTS

42. Shining 3D makes, uses, offers for sale, sells, and imports products that infringe one or more claims of the Asserted Patents.

43. For example, Shining 3D's AccuFab-F1 3D Printer ("F1"), AccuFab-CEL 3D Printer ("CEL"), and Ceramix Nano 3D Printer ("Ceramix Nano") infringe the Asserted Patents as set forth below.

44. Shining 3D launched the F1 commercially in 2025 and has marketed and sold it in the United States since that time. Exhibit 7 (https://www.linkedin.com/posts/f1-cg-cover-share-7313916411918053378-O_C_/).

45. Shining 3D describes the F1 as a high-speed, high-precision DLP 3D printer with high-resolution imaging and production-oriented features designed for dental applications. Exhibit 8 (https://www.shining3ddental.com/solution/accufab-f1/).

46. The F1 is a resin-based additive manufacturing system that builds 3D objects from photopolymer resin through stereolithographic layer-by-layer curing. The system includes (i) a DLP light engine positioned beneath a transparent material film and glass substrate, (ii) a resin tray

assembly configured to hold liquid photopolymer, (iii) a vertically removable build platform positioned above the resin tray, and (iv) electronic control systems for image projection, motion control, and positioning of the build platform.

## AccuFab F1 Specs

| | | | |
|---|---|---|---|
| **Printer Type** | DLP Printer | **Printer Size** | 330 x 350 x 575 mm |
| **Printer Weight** | 23kg | **Print Volume (x/y/z)** | 144 x 81 x 75 mm |
| **Resolution** | 1920 x 1080 | **Print Speed** | Max 150 mm/h (depend on different material and layer) |
| **Layer Thickness** | 50 μm~100 μm (adjustable) | **Accuracy** | ± 25 μm |
| **Connectivity** | USB / Wi-Fi / Ethernet | | |

Exhibit 8 (https://www.shining3ddental.com/solution/accufab-f1/) at 6 (showing how the F1 is a DLP Printer that uses layer-by-layer curing, with the "Layer Thickness" being adjustable, affecting print speed).

## The AccuFab F1: Why DLP Still Matters

Here's where Shining 3D surprised me again. While the entire industry is shifting to LCD printers, they released a new DLP printer - the AccuFab F1.



The reason for DLP rather than LCD? - "The quick answer is accuracy, that's what it came down to," Jorge explained. At $10,000 USD, it's actually competitive for a DLP printer that can achieve 25-micron accuracy and print crowns in 10-11 minutes.

*See* Exhibit 11 at 3 (https://instituteofdigitaldentistry.com/podcast/s03-e09-shining-3d-has-done-the-impossible-from-bad-to-market-leader-in-5-years/) (showing that the F1 is a DLP printer).



**AccuFab-F1 | High-Performance Dental 3D Printing Redefined**

*See* https://www.youtube.com/watch?v=9Id-5AMVhG8 (showing the resin tray assembly configured to hold liquid photopolymer and a vertically removable build platform positioned above the resin tray).




*See* https://www.youtube.com/watch?v=9Id-5AMVhG8 (showing how the DLP light engine, a projection system, is positioned below the entire substrate assembly, including the transparent material film and glass substrate, as well as the electronic controls for image projection, motion control, and build tray positioning).

47. Shining 3D launched the CEL commercially at LabDay 2024 in February 2024 and has marketed and sold it in the United States since that time. Exhibit 12 (https://shining3d.idealdent.net/news-post/shining-3d-introduces-accufab-cel-advancing-dental-3d-printing-at-labday-2024/) at 1-2.

48. Shining 3D describes the CEL as a high-speed, high-precision, high-accuracy LCD 3D printer with high-resolution imaging and production-oriented features designed for dental applications. Exhibit 10 (CEL User Manual) at 6.

49. The CEL is a resin-based additive manufacturing system that builds 3D objects from photopolymer resin through stereolithographic layer-by-layer curing. The system includes, among other things, (i) a chip-on-board (COB) UV-LED light engine and LCD screen light system positioned beneath a transparent material film and glass substrate, (ii) a resin tray assembly configured to hold liquid photopolymer, (iii) a vertically removable build platform positioned above the resin tray, and (iv) electronic control systems for image projection, motion control, and positioning of the build platform.

## 5.2 Optics Parameters

| Parameter | Description |
|---|---|
| Optical Engine | black-and-white LCD screen (9.25-inch 6K screen) |
| Resolution | 5760 px × 3600 px |
| Pixel Size | 0.035 mm |
| Light Source | 400 nm ~ 405 nm COB |
| Light Intensity | up to 8 mw/cm² |

## 7.2 Notice for Material

**Ultraviolet Light**

When curing resin or printing, the UV light source under the LCD screen projects 405 nm UV-LED light.

**Warning**

The UV Light is harmful to the eyes, so please avoid direct eye contact.

Exhibit 10 (CEL User Manual) at 13, 16 (showing that the CEL uses a COB 400-405 nm UV-LED positioned under an LCD screen enabling 6K resolution).




*See* https://www.youtube.com/shorts/0fkSqgVmHIQ (showing the resin tray assembly configured to hold liquid photopolymer and a vertically removable build platform positioned above the resin tray).

## AccuFab CEL Specs

| | | | |
|---|---|---|---|
| **Resolution** | 5760 x 3600 | **Print Volume (W x D x H)** | 70 x 70 x 180 mm / 192 x 120 x 180 mm |
| **Print Speed** | Max 100 mm/h (depends on layer thickness and materials) | **Accuracy*** | ± 35 µm |
| **Layer Thickness** | 50 µm~100 µm (Adjustable) | **Printer Size** | 360*360*530 mm |
| **Printer Weight** | 22 kg | **Connectivity** | USB, Wi-Fi, Ethernet |

Exhibit 9 (https://www.shining3ddental.com/solution/accufab-cel) at 6 (showing how the CEL uses layer-by-layer curing, with the "Layer Thickness" being adjustable, affecting print speed).




Exhibit 10 (CEL User Manual) at 19 (showing the light system positioned below the entire substrate assembly, including the transparent material film and glass substrate, as well as the electronic controls for image projection, motion control, and build tray positioning).

50. In addition to the F1 and CEL, Shining 3D sells and distributes related components and accessories, including resin tank assemblies, such as Shining 3D's HyperClear and Standard resin tanks. These components form part of the assemblies and systems claimed in the Asserted Patents.

| | |
|---|---|
| Resin tank version | FDAC1 (Hyper Clear) |
| For printer | Accufab-F1 |
| Volume of resin | Min:300ml<br>Max:600ml |
| Dimension | 314*194*40mm |
| Package size | 375*245*70 |
| Total weight | - |
| NFC Function | Yes |
| Film replacement kit | Yes |
| Picture |  |

Exhibit 13 (https://support.shining3ddental.com/en/support/solutions/articles/60001569623-resin-tank-versions-for-accufab-f1) at 1-2 (showing Shining 3D's HyperClear (FDAC1 HyperClear) resin tank, which is compatible with the F1).

| | |
|---|---|
| Resin tank version | FDAC1 |
| For printer | Accufab-F1 |
| Volume of resin | Min:300ml<br>Max:600ml |
| Dimension | 314*194*40mm |
| Package size | 375*245*70 |
| Total weight | - |
| NFC Function | Yes |
| Film replacement kit | Yes |
| Picture |  |

Exhibit 13 (https://support.shining3ddental.com/en/support/solutions/articles/60001569623-resin-tank-versions-for-accufab-f1) at 1 (showing Shining 3D's Standard (FDAC1) resin tank for the F1).




Exhibit 8 (https://www.shining3ddental.com/solution/accufab-f1/) at 6 (showing that "the F1 supports a Hyper Clear resin tank").




The AccuFab-CEL Dental 3D Printer: Higher, Faster, Easier

SHINING3D Dental
9.45K subscribers
Subscribe
33 Share Ask Save

## Frequently Asked Questions

**Does the 3D printer come with a heated build platform?** +

**Does the AccuFab CEL have a Hyper Clear resin tank?** —

Yes, the CEL supports a Hyper Clear resin tank.

**Can the AccuFab CEL build platform be used interchangeably with AccuFab L4D/L4K?** +

**Does the resin tank have NFC?** +

*See* https://www.youtube.com/watch?v=RCo92R9M7w4 (showing that the HyperClear resin tank is compatible and recommended for use with the CEL); *see also* Exhibit 9 (https://www.shining3ddental.com/solution/accufab-cel) at 7 (showing that "the CEL supports a Hyper Clear resin tank").

# Resin Tank Versions For AccuFab-CEL

**Ruby Yan**
Modified on: Tue, 20 May, 2025 at 5:21 PM

| | |
|---|---|
| Resin tank version | LAC1 |
| For printer | C |
| Volume of resin | Min: 625 ml<br>Max: 1100ml |
| Dimension | 315*205*40mm |
| Package size | 360*250*70 |
| Net weight | 820g |
| Total weight | - |
| NFC Function | Yes |
| Film replacement kit | Yes |
| Picture |  |




*See* Exhibit 14 (https://support.shining3ddental.com/en/support/solutions/articles/60001525664-resin-tank-versions-for-accufab-cel) at 1 (showing Shining 3D's Standard (LAC1) resin tank for the CEL); https://www.youtube.com/watch?v=o1huQoPjg1w (showing the CEL's standard resin tank).

51. The F1 and CEL are always sold with at least their Standard tanks because there is no option to buy an F1 or CEL without at least the Standard tank.




*See* https://www.youtube.com/watch?v=yWCsfo1yyS0 (showing an unboxing of the F1 and that the F1 is sold with a Standard (FDAC1) resin tray).




AccuFab-CEL Unboxing, Setup, and AccuWare Connection

*See* https://www.youtube.com/watch?v=T-6fhJG4MRI&t=5s (showing an unboxing of the CEL and that the CEL is sold with a Standard (LAC1) resin tank).

52. Further, the F1 and CEL are inoperable without the HyperClear or Standard resin tanks, as the resin tanks are what hold the liquid photopolymer for printing, and the F1 and CEL are not designed to operate with third-party tanks.

SHINING 3D DENTAL Dental Support Community Submit

# Resin Tank Versions For AccuFab-CEL

Ruby Yan
Modified on: Tue, 20 May, 2025 at 5:21 PM

| | |
|---|---|
| Resin tank version | LAC1 |
| For printer | C |
| Volume of resin | Min: 625 ml<br>Max: 1100ml |
| Dimension | 315*205*40mm |
| Package size | 360*250*70 |
| Net weight | 820g |
| Total weight | - |
| NFC Function | Yes |
| Film replacement kit | Yes |
| Picture |  |

| | |
|---|---|
| Resin tank version | LAC2 |
| For printer | For printer |
| Volume of resin | Min: 200 ml<br>Max: 350ml |
| NFC Function | No |
| Film replacement kit | Yes |
| Picture |  |




Exhibit 14 (https://support.shining3ddental.com/en/support/solutions/articles/60001525664-resin-tank-versions-for-accufab-cel) at 1-2 (showing a Shining 3D support page indicating the resin tank versions for the CEL, including only official Shining 3D resin tanks: the Standard (LAC1) resin tank and optional LAC2 for small printing); Exhibit 9 (https://www.shining3ddental.com/solution/accufab-cel) at 7 (showing that the CEL is also compatible with the official Shining 3D HyperClear resin tank).

SHINING 3D DENTAL Dental Support Community Submit

Dental Support › Solution home › AccuFab-F1 › Setting up the AccuFab-F1

# Resin Tank Versions For AccuFab-F1

**Ruby Yan**
Modified on: Wed, 5 Nov, 2025 at 2:08 PM

| | |
|---|---|
| Resin tank version | FDAC1 |
| For printer | Accufab-F1 |
| Volume of resin | Min:300ml<br>Max:600ml |
| Dimension | 314*194*40mm |
| Package size | 375*245*70 |
| Total weight | - |
| NFC Function | Yes |
| Film replacement kit | Yes |
| Picture |  |

**Note:** The difference between the two resin tank is the type of film used.

| | |
|---|---|
| Resin tank version | FDAC1 (Hyper Clear) |
| For printer | Accufab-F1 |
| Volume of resin | Min:300ml<br>Max:600ml |
| Dimension | 314*194*40mm |
| Package size | 375*245*70 |
| Total weight | - |
| NFC Function | Yes |
| Film replacement kit | Yes |
| Picture |  |

Exhibit 13 (https://support.shining3ddental.com/en/support/solutions/articles/60001569623-resin-tank-versions-for-accufab-f1) at 1-2 (showing a Shining 3D support page indicating the resin tank versions for the F1, including only official Shining 3D resin tanks: the Standard (FDAC1) resin tank and HyperClear (FDAC1 Hyper Clear) resin tank).

53. Shining 3D recently began to market, sell and offer for sale the Ceramix Nano in the United States. Exhibit 29 (https://www.shining3ddental.com/news-post/shining-3d-dental-launches-ceramix-nano-capsule-3d-printer-10-minute-permanent-ceramic-crowns-chairside).

54. Shining 3D describes the Ceramix Nano as a high-speed, high-precision DLP 3D printer with high-resolution imaging and production-oriented features designed for chairside dental applications. Exhibit 30 (https://www.shining3ddental.com/en/solution/ceramix-nano).

55. The Ceramix Nano is a capsule-based, resin-based additive manufacturing system that builds 3D objects from photopolymer resin through stereolithographic layer-by-layer curing. The system utilizes "Adaptive Pneumatic Stereolithography," which employs pneumatic layer separation based on continuous monitoring to adjust the peeling force in real time, layer by layer.

# Ceramix-Nano Specs

**Chairside Fabrication Unit**

| | | | |
|---|---|---|---|
| **Core Technology** | APS (Adaptive Pneumatic Stereolithography) | **Optical Engine** | DLP |
| **Wavelength** | 405 nm | **XY Resolution** | 50 μm |
| **Cycle Time** | Typical 8–11 mins (Average ~8 mins for anterior crowns) | **Dimensions (W × D × H)** | 87 x 131 x 276 mm |
| **Leveling** | Calibration-free Auto-leveling System | **Clinical Application** | Crown, Bridge (up to 3 units), Veneer, Inlay, Onlay |

**Post-Curing Parameters**

| | | | |
|---|---|---|---|
| **Curing Size** | 50 x 40 x 20 mm | **Curing Time** | ≤3min |
| **Light Intensity** | 200 mW/cm² | **Max Curing Temperature** | 80°C |
| **Curing Wavelength** | 360-385 nm | | |

Exhibit 30 (https://www.shining3ddental.com/en/solution/ceramix-nano) at 8 (showing that the Ceramix Nano is a DLP Printer that utilizes Adaptive Pneumatic Stereolithography).




Ceramix-Nano Capsule 3D Printer | Imagination Encapsulated




Ceramix-Nano Capsule 3D Printer | Imagination Encapsulated

*See* https://www.youtube.com/watch?v=XRLO-shSVpg (showing that the Ceramix Nano is a device that builds 3D objects from photopolymer resin through stereolithographic layer-by-layer curing).

56. Shining 3D's 3D Printers, including the F1, CEL, and Ceramix Nano, use Shining 3D's AccuWare software, which implements the infringing processes as further described below.




1 **Installation** SHINING 3D®

AccuWare is the data preparation software for AccuFab Printers. Which is independently developed by SHINING 3D. You can manipulate the model with positioning and orientation. And after that you can generate support structure for printing. Finally you can slice the model and send to printer. AccuWare is compatible with all AccuFab-Printers. The only difference is the sliced file format.

Exhibit 31 (AccuWare User Manual) at cover, 1 (showing that AccuWare software is the data preparation software for all AccuFab printers, which necessarily includes the F1 and CEL, and is software for preparing, processing, and printing three-dimensional objects with the Accused Products).

SHINING 3D DENTAL Dental Support Community Submit a ticket My tickets English Login

Dental Support › Solution home › Dental Software › AccuWare

## Download AccuWare

**Sheldon - APAC**
Modified on: Tue, 30 Jun, 2026 at 11:17 AM

This article applies to AccuFab-L4D/K, AccuFab-D1s, AccuFab-D1, AccuFab-CEL, AccuFab-F1, AccuFab-Aris, Ceramix-Nano.

This article summarizes the release note for each version of AccuWare , the Data preparation Software For AccuFab printer.

For PC environment please refer to AccuWare_PC and Working Environment Requirements

Related Articles

- Download FabWare
- Download User Manual
- AccuWare_PC and Working Environment Requirements
- Accuware YouTube Video Collection
- Getting the latest material packages
- Z compensation
- Multi-platform Application Guide
- AccuWare V3.2.1.X Updated Content

Exhibit 32 (https://support.shining3ddental.com/en/support/solutions/articles/60000716500-download-accuware) at 1 (showing that AccuWare is software utilized for the Ceramix Nano).

## Installation

### AccuWare Installation

1. Insert the USB flash drive into the computer. Copy the installation file "AccuWare_3.2.X.XXX_release_install.exe" to the computer and then run it. Install AccuWare following the installation wizard. Click **Finsh** to complete the installation and run the software.
2. Import printer profile: Select the required .sndev file according to the prompts and click **Import**. Then you can add a new machine.
3. Update material profile: Click **Settings** in the lower left corner and enter the interface of **About Update**. Then you can complete the update of the material parameter package.

Ceramix-Nano Instructions for Use V1.0 Page 16 of 38

Exhibit 33 (Ceramix Nano Instructions for Use) at 16 (showing that AccuWare software comes with the Accused Products on a USB drive, is installed onto a computer, and then connected to an Accused Product by importing a printer profile onto the AccuWare software).

57. Accordingly, as used herein, the "Accused Products" refers collectively to (a) the F1 printer, together with its associated resin tank assemblies, including the HyperClear and Standard resin tanks, any related components, accessories, and software, including AccuWare software; (b) the CEL printer, together with its associated resin tank assemblies, including the HyperClear and Standard resin tanks, any related components, accessories, and software, including AccuWare software; and (c) the Ceramix Nano, and any related components, accessories, and software, including AccuWare software.

58. Shining 3D markets, sells and offers for sale the Accused Products for sale in the U.S. through its website, which directs customers to obtain a quote for the Accused Products, and through its U.S. sales and distribution channels. Exhibit 8 ("Get a quote") (https://www.shining3ddental.com/solution/accufab-f1/) at 1; Exhibit 9 ("Get a quote") (https://www.shining3ddental.com/solution/accufab-cel) at 1; Exhibit 30 ("Get a quote") (https://www.shining3ddental.com/en/solution/ceramix-nano) at 1; Exhibit 15 ("Become a Reseller") (https://www.shining3d.com/become-a-reseller) at 1; *see also* Exhibit 16 (https://www.itxpros.com/shining3d) at 1 ("ITXPROS and Shining 3D are proud to announce their latest collaboration to distributed Digital Dentistry solutions in USA.").

59. Shining 3D is well acquainted with SprintRay, its products, and its patent portfolio. Shining 3D has long had knowledge of SprintRay and its patent portfolio. The two companies have been well acquainted in the dental industry for years. From the start, SprintRay has worked to bring same-day dental care to patients by placing 3D printing technology directly in the hands of clinicians, while Shining 3D built its dental business on 3D scanning, such as in-chair scanning of teeth to create dental appliances without a traditional mold. In late 2025, SprintRay co-founder Liang Jin met with Shining 3D's chief executive officer, Li Tao, to discuss a potential collaboration between the two companies. Liang Jin told Li Tao about SprintRay's patents and products, including its newest printer, the Midas capsule 3D printer, and proposed a partnership that would combine SprintRay's 3D printers with Shining 3D's 3D scanners. Li Tao responded that he was open to collaborating and that he was not interested in 3D printing. Shortly afterward, however, SprintRay discovered that Shining 3D had begun hiring away SprintRay employees in December 2025, and Liang Jin raised the issue with Li Tao

in early 2026. Li Tao claimed he was unaware of the hiring, but represented that Shining 3D would not poach any more SprintRay employees.

60. On April 18, 2026, Li Tao, Shining 3D's Marketing Director, and its Channel Manager, visited SprintRay's manufacturing facility and exhibition hall in China, where SprintRay gave them a tour and showed them its technology. SprintRay prominently displays information about its extensive patent portfolio in that exhibition hall and recounts its history of innovation in dental 3D printing since its founding in 2014. SprintRay's printers are also on display there, including the Midas printer, which is marked as "patented." After this meeting, Shining 3D hired away two more SprintRay employees from sales and technical support, roles that both require technical familiarity with SprintRay's patented products. SprintRay has further correspondence with Shining 3D about these departures. Then, in June, Shining 3D launched its own Ceramix Nano 3D capsule printer in direct competition with the Midas, making a deliberate entry into SprintRay's printer market, despite representing that it would not do so and after hiring away several SprintRay employees.

61. Additionally, Shining 3D has attended the same trade shows as SprintRay in recent years. For example, at the International Dental Show in 2025, Shining 3D's exhibitor booth was just a few booths away from SprintRay. And, at the California Dental Association show in May 2026, in Anaheim, California, Shining 3D's exhibitor booth was directly in front of SprintRay's, where SprintRay openly displayed and promoted its 3D dental printers, including the Midas. At the June 2026 MOD Symposium in Austin, Texas, Shining 3D's booth was next to SprintRay's and Shining 3D promoted and displayed only its Ceramix Nano, to the exclusion of its 3D dental scanning products, and its sales representative repeatedly told attendees that the Ceramix Nano is just like the Midas.

62. Shining 3D markets its recently released Ceramix Nano as an equivalent of the Midas. Dental-industry publications also recognized the fact that the Ceramix-Nano was positioned as a direct competitor to SprintRay's Midas. For example, the Institute of Digital Dentistry compared the Ceramix-Nano with SprintRay's Midas, discussing their respective printing technologies, capsule based workflows, equipment pricing, and consumable costs. *See* Exhibits 34, 35 (Shining 3D Launches a New Pod Printer, the Ceramix-Nano and the New AccuFab-Aris, Institute of Digital

Dentistry, June 18, 2026 and Shining 3D Ceramix-Nano Unboxing – Hands-On First Look, Institute of Digital Dentistry, August 26, 2026). Other industry publications compared the Ceramix-Nano against SprintRay's Midas as competing capsule-based chairside crown printers, comparing their respective workflows, materials, software ecosystems, and commercial considerations. *See* Exhibit 36 (Ceramix-Nano vs SprintRay Midas: How to Compare Capsule Chairside Crown Printers, Dentcore, June 22, 2026). Another publication described Shining 3D's entry into capsule-based printing as a response to SprintRay's Midas. *See* Exhibit 34 (Shining 3D Launches a New Pod Printer, the Ceramix-Nano and the New AccuFab-Aris, Institute of Digital Dentistry, June 18, 2026).

63. Thus, Shining 3D was well aware that SprintRay was an established innovator and patent holder in the dental 3D-printing field and knew or should have known of its infringement of the Asserted Patents. When Shining 3D nonetheless entered that same field with the Accused Products, it did so with knowledge of SprintRay's competing products and patent portfolio or, at a minimum, subjectively believed there was a high probability that SprintRay held patents covering that technology and deliberately avoided confirming the existence and scope of those patents before launching the Accused Products. A sophisticated competitor who interacted and knew SprintRay well that deliberately entered a field it had previously disclaimed to SprintRay, who it knew had an extensive patent portfolio, would have or should have known of SprintRay's Asserted Patents before entering the market, and thus, on information and belief, Shining 3D knew of SprintRay's Asserted Patents and its infringement of them, or deliberately chose not to investigate them.

64. SprintRay filed its Complaint in this action, identifying the patents then asserted, the Accused Products, and the specific configurations and operations alleged to infringe those patents. Shining 3D received actual notice of those patents and SprintRay's infringement allegations no later than July 6, 2026. The original Complaint and accompanying exhibits provided Defendants with particularized notice of the Asserted Patents and the conduct SprintRay alleged to constitute infringement.

65. Following the filing of the original Complaint, Shining 3D received further notice of its worldwide infringement of SprintRay's patent rights through the filing of additional proceedings in

Germany and China, and its own conduct in those forums confirms that it monitors SprintRay's patent portfolio. On or about October 16, 2026, Shining 3D filed a protective letter (*Schutzschrift*) with the German court, a pre-emptive defensive filing intended to forestall an *ex parte* preliminary injunction, that expressly addressed SprintRay's European Patent No. EP 1 849 586 B1, demonstrating that Shining 3D was closely tracking SprintRay's patent rights and anticipating their enforcement. On or about October 23, 2026, SprintRay commenced patent infringement proceedings against Shining 3D in the Munich Regional Court I (Landgericht München I), Germany, asserting European Patent No. EP 1 849 586 B1, a patent within the same family as the ’921 and ’143 Patents. On or about August 26, 2026, SprintRay commenced patent infringement proceedings against Shining 3D in Shenzhen Intermediate People’s Court, asserting Chinese patents CN101063811B and CN101063812B. These post-complaint proceedings further demonstrate Shining 3D’s knowledge of SprintRay’s patented technology at issue here.

66. After receiving actual notice of the patents asserted in the original Complaint and the conduct alleged to infringe them, Shining 3D continued to affirmatively promote, instruct, assist, and encourage customers, authorized resellers, distributors, and end users to use the Accused Products in the specific configurations and operating modes alleged to infringe those patents. For example, following the filing of the original Complaint on June 18, 2026, Shining 3D continued to provide customers with software, technical guidance, and product-specific instructions directing them to configure and operate the accused AccuFab-CEL and AccuFab-F1 printers in an infringing way, as further described below.

67. Shining 3D’s AccuWare software download page, identified as last modified on June 30, 2026, provides customers with access to AccuWare software for use with the accused AccuFab-CEL, AccuFab-F1 and Ceramix-Nano printers, including version 3.2.2.65, dated June 2026. Exhibit 32 (Download AccuWare, Shining 3D Dental Support Center). The accompanying software release materials identify functionality that enables customers to prepare, configure, slice and submit printing jobs to the accused printers, including material selection, automated model layout, support generation, and one-click printing. By continuing to distribute AccuWare and provide instructions concerning

these functions, Shining 3D affirmatively facilitates and encourages customers to select printing configurations, prepare printing jobs, and initiate printing operations using the Accused Products, including the resin tank assemblies and operating configurations alleged to infringe the Asserted Patents, as further described below.

68. Shining 3D further provided customer-facing instructions concerning specific resin tanks and printing configurations to be used with the Accused Products. For example, its "Splint Hard Resin Application Guide," identified as modified on September 9, 2026, nearly three months after the original Complaint was filed, expressly recommends and encourages that customers use the AccuFab-CEL printer with the HyperClear resin tank to fabricate dental splints and provides specific instructions for carrying out that printing workflow. Exhibit 37 (Splint Hard Resin Application Guide, Shining 3D Dental Support Center). Although Shining 3D made updates to the guide following the filing of the original Complaint, Shining 3D failed to remove the instructions that specifically encourage infringement in that update. Exhibit 38 (Splint Hard Resin Application Guide Wayback). The guide continues to direct customers through the printing workflow, including transferring the splint design into AccuWare, selecting the AccuFab-CEL printer, and initiating Shining 3D's "one-click" printing function, which automatically performs model layout, support generation, slicing, and submission of the print job. The guide specifically recommends the one-click printing functionality when using the HyperClear resin tank.

69. In addition, Shining 3D continued to provide customer-facing resin compatibility guidance for the AccuFab-CEL and AccuFab-F1 printers, including in materials identified as modified on September 18, 2026. Exhibit 39 (CEL-3rd Party Materials Available for AccuFab Printers, Shining 3D Dental Support Center); Exhibit 40 (F1-3rd Party Materials Available for AccuFab Printers, Shining 3D Dental Support Center). These materials identify specific third-party resins compatible with the accused printers and provide corresponding printing parameters, including recommended layer thicknesses. For example, the AccuFab-CEL compatibility guidance identifies Graphy TA-28 HC and TC-85DAC HC materials and specifies a 0.1 mm layer thickness for those materials. The AccuFab-F1 compatibility guidance likewise identifies compatible resin materials and corresponding layer

thicknesses, including 0.05 mm and 0.1 mm settings. By providing these product-specific material recommendations and printing parameters, Shining 3D affirmatively instructs customers how to select compatible resins and configure the Accused Products for printing, thereby encouraging customers to operate the accused printers in the specific configurations and manners described herein, including those alleged to infringe the Asserted Patents, as further set forth in the individual Counts below.

70. On information and belief, despite receiving actual notice of the Asserted Patents and the conduct alleged to infringe them, Shining 3D continues to encourage customers to use the Accused Products in the specific configurations and operating modes described above. Shining 3D's continued provision of the software, technical instructions, and recommended printing configurations identified above, together with its knowledge of SprintRay's infringement allegations, supports a reasonable inference that Shining 3D specifically intended to induce customers to engage in the allegedly infringing conduct described in the individual Counts below.

**COUNT I**
**(Direct Infringement of the '371 Patent)**

71. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

72. Shining 3D has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '371 Patent in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and importing into the United States the Accused Products without permission, consent, authorization, or license from SprintRay.

73. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the '371 Patent. Claim 1 recites the following limitations:

> A device for producing a three-dimensional object from a solidifiable material comprising:
>
> > an imaging unit comprising a predetermined number of discrete imaging elements;
> > an imaging unit controller configured to control the discrete imaging elements, wherein each of the discrete imaging elements corresponds to a location on an exposed surface of the solidifiable material and projects electromagnetic radiation based on a corresponding scaled intensity value onto the corresponding location on the exposed surface of the solidifiable material, each scaled intensity value is based on a corresponding compensation light intensity value selected from the group consisting of

a measured light intensity value and a light intensity value interpolated from measured light intensity values, each measured light intensity value is determined by measuring a light intensity at a selected location of the exposed surface of the solidifiable material, and each scaled intensity value is selected from the group consisting of a gray scale value and a color value.

74. The Accused Products include, without limitation, a device for producing a three-dimensional object from a solidifiable material as claimed in the ’371 Patent. The Accused Products include the F1, CEL, and Ceramix Nano, which are devices for producing three-dimensional objects from solidifiable material.




*See* https://www.youtube.com/watch?v=XSVhYLMv1zc (showing that the F1 is a device for producing three-dimensional objects from solidifiable material).













*See* https://www.youtube.com/watch?v=RCo92R9M7w4 (showing that the CEL is a device for producing three-dimensional objects from solidifiable material).




Ceramix-Nano Capsule 3D Printer | Imagination Encapsulated




Ceramix-Nano Capsule 3D Printer | Imagination Encapsulated

*See* https://www.youtube.com/watch?v=XRLO-shSVpg (showing that the Ceramix Nano is a device for producing three-dimensional objects from solidifiable material).

75. The Accused Products include an imaging unit comprising a predetermined number of discrete imaging elements. The F1 includes an imaging unit comprising an LED DLP light engine and a 1920-pixel by 1080-pixel LCD screen, the CEL includes an imaging unit comprising a 400-405 nm Chip-on-Board (COB) UV-LED and a 5760-pixel x 3600-pixel LCD screen, and the Ceramix Nano includes an imaging unit comprising an LED DLP light engine having a 640 x 360 pixel image resolution and a projected pixel size of 0.05 mm, providing a predetermined number of discrete imaging elements corresponding to the 640 x 360 pixel array.

## The AccuFab F1: Why DLP Still Matters

Here's where Shining 3D surprised me again. While the entire industry is shifting to LCD printers, they released a new DLP printer - the AccuFab F1.



The reason for DLP rather than LCD? - "The quick answer is accuracy, that's what it came down to," Jorge explained. At $10,000 USD, it's actually competitive for a DLP printer that can achieve 25-micron accuracy and print crowns in 10-11 minutes.

*See* Exhibit 11 at 3 (https://instituteofdigitaldentistry.com/podcast/s03-e09-shining-3d-has-done-the-impossible-from-bad-to-market-leader-in-5-years/) (showing that the F1 is a DLP printer).

| Parameter | Description |
|---|---|
| Optical Engine | black-and-white LCD screen |
| Resolution | 1920 px x 1080 px |
| Pixel Size | 0.075 mm |
| Light Source | 405 nm UV-LED |
| Light Intensity | 4 ~ 12 mw/cm² |

Exhibit 17 (F1 User Manual) at 17 (showing that the imaging unit is a DLP light engine including a 405 nm UV-LED and a digital micromirror device having a 1920 pixel x 1080 pixel discrete mirror array).

## 5.2 Optics Parameters

| Parameter | Description |
|---|---|
| Optical Engine | black-and-white LCD screen (9.25-inch 6K screen) |
| Resolution | 5760 px × 3600 px |
| Pixel Size | 0.035 mm |
| Light Source | 400 nm ~ 405 nm COB |
| Light Intensity | up to 8 mw/cm² |

## 7.2 Notice for Material

**Ultraviolet Light**

When curing resin or printing, the UV light source under the LCD screen projects 405 nm UV-LED light.

**Warning**

The UV Light is harmful to the eyes, so please avoid direct eye contact.

Exhibit 10 (CEL User Manual) at 13, 16 (showing that the CEL uses a 400-405 nm COB UV-LED positioned under an LCD screen with a 5760 pixel x 3600 pixel array).

| Printing Parameters | Description |
|---|---|
| Optical Engine | DLP |
| Resolution Ratio | 640 * 360, RGB signal |
| Pixel Size | 0.05 mm |
| Light Source | LED light source |
| Light Wavelength | 400 nm ~ 410 nm |
| Light Power | The maximum power ≥ 15mw/cm² |
| Maximum Forming Size | φ17 * 40 |
| Printing Speed | Printing time for a single crown ≤ 8 min |
| Printing Size Tolerance | ≤ 0.05 mm |

Ceramix-Nano Instructions for Use V1.0 Page 34 of 38

Exhibit 33 (Ceramix Nano Instructions for Use) at 34 (showing that the imaging unit is a DLP light engine including a 640 pixel by 360 pixel array).

76. The Accused Products include an imaging unit controller in the form of an integrated circuit board configured to control the discrete imaging elements through the integrated circuit board's wired connection to the imaging unit.




*See* https://www.youtube.com/watch?v=HoYG3sLd9YM (showing, for example, the F1's imaging unit, the DLP light engine and LCD screen, and imaging unit controller, an integrated circuit board electrically connected to and configured to control the discrete imaging elements of the imaging unit).

77. In the Accused Products, each of the discrete imaging elements corresponds to a location on an exposed surface of the solidifiable material and projects electromagnetic radiation onto that corresponding location. This results in a visible pattern of electromagnetic radiation on the exposed surface of the solidifiable material.







Exhibit 41 (https://support.shining3ddental.com/en/support/solutions/articles/60001641272-light-intensity-correction-function-f1-side-optical-power-meter-adjustable-) (showing, for example, how in the F1, the plurality of discrete imaging elements project electromagnetic radiation in a pattern onto

corresponding locations of the glass substrate, which in turn correspond to locations on an exposed surface of the solidifiable material when the resin tank filled with photosensitive resin is placed on top of the glass substrate during printing); *see* https://www.youtube.com/watch?v=odXbL593hVA&t=7s (showing the same in the CEL).

78. SprintRay is informed and believes that the discrete imaging elements in the Accused Products project electromagnetic radiation at non-uniform intensities. For example, on information and belief, when the Accused Products are used to print a solid, uniform cuboid, the intensity across all pixels would, absent modulation, be uniform (i.e., a grayscale value of 255). However, SprintRay is informed and believes that a capture of the projected image shows that the center pixels have a lower grayscale value while the edge pixels have a higher grayscale value.

79. SprintRay is informed and believes that the intensity of the electromagnetic radiation projected by the discrete imaging elements is based on a corresponding scaled intensity value that is determined by measuring the light intensity at selected locations of the exposed surface of the solidifiable material. In particular, based on publicly available information, SprintRay is informed and believes that the Accused Products utilize a two-step verification and calibration process in which the light intensities at various locations of the exposed surface of the solidifiable material are measured and then the light intensities at the discrete imaging elements are scaled based on that measurement.

- **Light Uniformity Verify**:
  a. Please follow the instructions to remove the resin tank, clean the glass, and tap **Next**; then connect the optical power meter probe and tap **Detection**.
  b. 13 circles will be illuminated on the software sequentially, and please place the probe on the corresponding illuminated circular spot on the projection screen to capture the light power, and the value will be recorded on the corresponding circle on the interface.

- **Light Intensity Correction**:
  a. Please follow the instructions to remove the resin tank, clean the glass, and tap **Next**; then connect the optical power meter probe and tap **Correction**.
  b. The light will be projected onto the screen, and the printer will enter the low, medium and high power automatic calibration process, until prompted with "Automatic correction complete".

Exhibit 17 (F1 User Manual) at 30-31 (showing how the Accused Products utilize a two-step process to measure the light intensity at various locations of the exposed surface of the solidifiable material (Light Uniformity Verify) and adjust or scale the intensity value of the electromagnetic radiation projected by each discrete imaging element based on said measurements (Light Intensity Correction)); *see also* Exhibit 10 (CEL User Manual) at 26-27 (same).




(•NFC•)
Light Uniformity Verify
Light uniformity verification
CEL - Light uniformity and intensity correction
Unlisted
Shining3D Dental Academy
20 subscribers
Subscribe
0
Share
Save
Download


Light Intensity Correction
Light intensity correction
CEL - Light uniformity and intensity correction
Unlisted
Shining3D Dental Academy
20 subscribers
Subscribe
0
Share
Save
Download




*See* https://www.youtube.com/watch?v=odXbL593hVA&t=7s (showing how the CEL utilizes a two-step verification and calibration process in which the light intensities at various locations of the exposed surface of the solidifiable material are measured and then the light intensities at the discrete imaging elements are scaled or calibrated based on that measurement).


NFC


Light Intensity Correction
Step 2
Please insert the power meter in USB port and place the probe shown in diagram
Correction


NFC




Exhibit 42 at 8-9 (https://support.shining3ddental.com/en/support/solutions/articles/60001641290-light-uniformity-verify-function-f1-), Exhibit 41 (https://support.shining3ddental.com/en/support/solutions/articles/60001641272-light-intensity-correction-function-f1-side-optical-power-meter-adjustable-) (showing how the F1 utilizes a two-step verification and calibration process in which the light intensities at various locations of the exposed surface of the solidifiable material are measured and then the light intensities at the discrete imaging elements are scaled or calibrated based on that measurement).

Printer light intensity detection and calibration

**Detection**

1. After entering the printer light intensity detection and calibration page, follow the on-screen prompts to remove the nano bottle and clean the printing platform glass with a lint-free cloth.
2. Use a Type-C adapter to insert the light power meter into the Type-C port, then place the probe at the indicated position.





3. Tap **Start Detection**, wait for the light intensity detection to complete.

Ceramix-Nano Instructions for Use V1.0 Page 22 of 38

- If all items display in **green**, it indicates detection is passed. Tap **Complete** to exit detection.
- If one item displays in **yellow**, it indicates it does not meet requirements and calibration is recommended.

**Calibration**

1. Tap **Start Calibration**, perform low, medium, and high power calibration sequentially.
2. After calibration is complete, the page will display the calibrated values.

⚠ **Caution**:

- During calibration, do not move the light power meter.
- If calibration fails, please retry or contact technical support according to the on-screen prompts.

Exhibit 33 (Ceramix Nano Instructions for Use) at 22-23 (showing how the Ceramix Nano utilizes a two-step process to measure the light intensity at the exposed surface of the solidifiable material (Light

Intensity Detection) and adjust or scale the intensity value of the electromagnetic radiation projected by each discrete imaging element based on said measurements (Light Intensity Calibration)).

80. SprintRay is informed and believes that the imaging unit controller in the Accused Products is configured to control the discrete imaging elements by intentionally modifying the grayscale values assigned to each discrete imaging element based on the respective location of its projected electromagnetic radiation on the exposed surface of the solidifiable material. Specifically, SprintRay is informed and believes that the imaging unit controller assigns lower grayscale values (i.e., darker values) to center pixels to compensate for inherently higher light intensity at those locations, and higher grayscale values (i.e., brighter values) to edge pixels to compensate for inherently lower light intensity at those locations by applying a "compensation mask."

81. SprintRay is informed and believes that the imaging unit controller applies the "compensation mask" shown above to scale the grayscale value of the electromagnetic radiation projected by each discrete imaging element based on corresponding compensation light intensity values derived from the two-step measurement and calibration process described above, thereby achieving light uniformity across the exposed surface of the solidifiable material.

82. Shining 3D's infringement of the '371 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

83. Shining 3D's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

84. Since at least receiving notice of the '371 Patent through service of this Complaint, Shining 3D has continued its infringing conduct with knowledge of the '371 Patent.

85. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283 and 284 for Shining 3D's direct infringement of the '371 Patent.

**COUNT II**
**(Indirect Infringement of the '371 Patent)**

86. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

87. As set forth above, at least upon service of this Complaint, Shining 3D had knowledge of the '371 Patent and of its infringement thereof.

88. After acquiring knowledge of the '371 Patent, Shining 3D has actively, knowingly, and intentionally induced infringement of the '371 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers, distributors, and end users to meet the elements of at least Claim 1 of the '371 Patent. Such use is consistent with how the Accused Products are described to directly infringe the '371 Patent and how they are intended to be used, as described above and incorporated by reference here. Indeed, there is no way to use the Accused Products to 3D print without invoking the infringing aspects of the Accused Products as described for Count II, and the Accused Products have no purpose other than to 3D print.

89. Shining 3D knew or was willfully blind to the fact that it was inducing others, including customers, authorized resellers, distributors, and end users to infringe the '371 Patent, including at least Claim 1. Shining 3D's inducement includes, without limitation, providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products in an infringing manner. *See generally* Exhibit 17 (F1 User Manual) (instructing others how to unpack, install, configure, and use the Accused Products), Exhibit 10 (CEL User Manual) (same), Exhibit 33 (Ceramix Nano Instructions for Use) (same), Exhibit 18 (F1 Brochure) (promoting and marketing the Accused Products), Exhibit 19 (CEL Brochure) (same), Exhibit 43 (Ceramix Nano Brochure) (same).


SHINING 3D DENTAL

PRODUCTS 3D SOFTWARE RESOURCES SUPPORT Get a quote

## Resource center

Explore our library of product information, clinical resources, case studies, and downloadable materials to support your digital dentistry workflow.

ALL RESOURCES | CASE STUDIES | WEBINARS | BLOG | EVENT

Exhibit 20 (https://www.shining3ddental.com/resource-center?search=&type=201389934202) at 1-2 (showing how Shining 3D operates a "Resource Center" providing case studies, webinars, blogs, and events for the Accused Products).


# Get Started with Dental 3D Printing for Your Clinics

Ready to bring 3D dental model printing into your clinics? You need a reliable partner.

The SHINING 3D DENTAL AccuFab-F1 is a dental 3D printer worth considering. It employs advanced DLP light-curing technology and offers a printing accuracy of ±25μm. It is designed specifically for dental clinics. Features include:

- · **Fast:** A maximum printing speed of 150 mm/h (depending on material and layer), suitable for a wide range of intraoral restorations or models.
- · **Open Material System:** Offers 13 resin options and supports third-party dental resins (subject to validation).
- · **Integrated Workflow:** Compatible with automated integration of cleaning and curing equipment.
- · **User-Friendly:** An intuitive interface that simplifies device setup and operation.

For more detailed information about 3D printing in dental industry, contact SHINING 3D DENTAL now. This may be the key step to gaining a competitive edge and staying ahead of your peers.

*See, e.g.*, Exhibit 21 (https://www.shining3ddental.com/blog/guide-to-buying-3d-dental-printers) at 5 (promoting and marketing the F1 to users, including features such as "advanced DLP light-curing technology," "a printing accuracy of ± 25μm," an "[o]pen [m]aterial [s]ystem," and that it is "designed specifically for dental clinics").




*See, e.g.*, Exhibit 19 (CEL Brochure) at 2 (promoting and marketing the CEL to users as a "premium-level printing experience," including features such as improved printing speed and a high-performance light panel).




*See, e.g.*, Exhibit 30 (https://www.shining3ddental.com/en/solution/ceramix-nano) at 1, 4 (promoting and marketing the Ceramix Nano to users, including features such as "adaptive pneumatic stereolithography," that it is built for "same-hour dentistry," uses "ceramic resin inside . . . [a] capsule," and that it is "[t]ested by [c]linicians").




*See* https://www.youtube.com/watch?v=XSVhYLMv1zc (instructing and encouraging use of the F1 to print 3D-objects, including for dental use).












*See* https://www.youtube.com/watch?v=RCo92R9M7w4 (demonstrating and encouraging use of the CEL to print 3D-objects, including for dental use).




Ceramix-Nano Capsule 3D Printer | Imagination Encapsulated

*See* https://www.youtube.com/watch?v=XRLO-shSVpg (instructing and encouraging use of the Ceramix Nano to print 3D-objects, including for dental use).




How to Clean the HyperClear Resin Tank?

*See* https://www.youtube.com/watch?v=v5CNmM-d8Ho (instructing users how to clean and maintain the HyperClear resin tank to promote its infringing use to print 3D objects).

90. After having acquired knowledge of the ’371 Patent, Shining 3D has also contributorily infringed the ’371 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the ’371 Patent and are not staple articles suitable for substantial non-infringing use. For example, as discussed above, Shining 3D sells and distributes resin tray assemblies such as Shining 3D’s HyperClear and Standard resin tanks, as well as resin capsules specifically for use with the Ceramix Nano, including Shining 3D’s LumiCera resin capsule, which are all components that form part of the assemblies and systems claimed in the Asserted Patents specifically for use with Shining 3D printers. Exhibit 13 (https://support.shining3ddental.com/en/support/solutions/articles/60001569623-resin-tank-versions-for-accufab-f1) at 1-2 (showing Shining 3D’s Standard (FDAC1) and HyperClear (FDAC1 HyperClear) resin tanks); https://www.youtube.com/watch?v=o1huQoPjg1w (showing the CEL’s

standard resin tank); Exhibit 9 (https://www.shining3ddental.com/solution/accufab-cel) at 7 (showing that "the CEL supports a Hyper Clear resin tank"); Exhibit 30 (https://www.shining3ddental.com/en/solution/ceramix-nano) at 4 (showing Shining 3D's LumiCera resin capsule for use specifically with the Ceramix Nano).

91. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. When the Accused Products are used as intended, i.e., to 3D print an object, the Accused Products, including these resin tanks and dental materials, embody and are used as components of the apparatus of at least Claim 1, as described above. There is no way to use the Accused Products to 3D print without using the apparatus that infringes at least Claim 1 or the process claims of the '371 Patent, and the Accused Products have no purpose other than to 3D print. Thus, Shining 3D has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components are especially made or adapted for use in infringing the '371 Patent and are not staple articles suitable for substantial non-infringing use.

92. Shining 3D has knowingly and actively aided and abetted, encouraged, and contributed to the direct infringement of the '371 Patent by its customers, resellers, and distributors. Such instructions and encouragement include, but is not limited to, advising third parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the '371 Patent, and by advertising and promoting the use of the Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner.

93. Shining 3D's indirect infringement of the '371 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

94. Shining 3D's indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Shining 3D's indirect infringement.

**COUNT III**
**(Direct Infringement of the '921 Patent)**

95. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

96. Shining 3D has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '921 Patent in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and importing into the United States the Accused Products without permission, consent, authorization, or license from SprintRay.

97. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the '921 Patent. Claim 1 recites the following limitations:

A device for producing a three-dimensional object, comprising:

> an imaging unit comprising a predetermined number of discrete imaging elements (pixels), wherein the discrete imaging elements supply electromagnetic radiation capable of solidifying a solidifiable material;
>
> at least one of a computer unit, an IC and a software implementation; wherein the at least one of a computer unit, an IC and a software implementation controls the exposure of a portion of the solidifiable material to energy supplied by the imaging unit in accordance with multiple successive raster masks (bitmaps), and the portion of the solidifiable material corresponds to a cross-section of the three-dimensional object.

98. The Accused Products include, without limitation, a device for producing a three-dimensional object from a solidifiable material as claimed in the '921 Patent. The Accused Products include the F1, CEL, and Ceramix Nano, which are devices for producing three-dimensional objects from solidifiable material. *See* https://www.youtube.com/watch?v=XSVhYLMv1zc (showing that the F1 is a device for producing three-dimensional objects from solidifiable material); https://www.youtube.com/watch?v=RCo92R9M7w4 (showing that the CEL is a device for producing three-dimensional objects from solidifiable material); https://www.youtube.com/watch?v=XRLO-

shSVpg (showing that the Ceramix Nano is a device for producing three-dimensional objects from solidifiable material).

99. The Accused Products include an imaging unit comprising a predetermined number of discrete imaging elements (pixels) that supply electromagnetic radiation capable of solidifying a solidifiable material. The F1 includes an imaging unit comprising an LED DLP light engine and a 1920-pixel by 1080-pixel LCD screen, the CEL includes an imaging unit comprising a 400-405 nm Chip-on-Board (COB) UV-LED and a 5760-pixel x 3600-pixel LCD screen, and the Ceramix Nano includes an imaging unit comprising an LED DLP light engine having a 640 x 360 pixel image resolution and a projected pixel size of 0.05 mm, providing a predetermined number of discrete imaging elements corresponding to the 640 x 360 pixel array. *See* Exhibit 11 at 3 (https://instituteofdigitaldentistry.com/podcast/s03-e09-shining-3d-has-done-the-impossible-from-bad-to-market-leader-in-5-years/) (showing that the F1 is a DLP printer); Exhibit 17 (F1 User Manual) at 17 (showing that the imaging unit is a DLP light engine including a 405 nm UV-LED and a digital micromirror device having a 1920 pixel x 1080 pixel discrete mirror array); Exhibit 10 (CEL User Manual) at 13, 16 (showing that the CEL uses a 400-405 nm COB UV-LED positioned under an LCD screen with a 5760 pixel x 3600 pixel array); Exhibit 33 (Ceramix Nano Instructions for Use) at 34 (showing that the imaging unit is a DLP light engine having a 640 pixel by 360 pixel array).

100. The Accused Products include an integrated circuit board configured to control the discrete imaging elements through the integrated circuit board's wired connection to the imaging unit. *See* https://www.youtube.com/watch?v=HoYG3sLd9YM (showing the F1's imaging unit, the DLP light engine and LCD screen and integrated circuit board electrically connected to and configured to control the discrete imaging elements of the imaging unit); https://www.youtube.com/watch?v=HoYG3sLd9YM (showing the CEL's imaging unit, the COB UV LED and LCD screen, and imaging unit controller, an integrated circuit board electrically connected to and configured to control the discrete imaging elements of the imaging unit).

101. SprintRay is informed and believes that in the Accused Products, the integrated circuit board controls the exposure of a portion of the solidifiable material corresponding to a cross-section of

the three-dimensional object to energy supplied by the imaging unit in accordance with multiple successive raster masks or bitmaps. Specifically, SprintRay is informed and believes, based on publicly available information shown below, that for a given cross-section, the integrated circuit board causes the imaging unit to project electromagnetic radiation corresponding to at least two successive bitmaps having the same measured intensity: Bitmap 1, encompassing both the support region and the 3D object region, and Bitmap 2, encompassing the support region.



Accuware software - how to work with a new resin

*See* https://www.youtube.com/watch?v=M_BzmzEJlGs (showing that, in AccuWare, the Fill Exposure Time and Boundary Exposure Time are both 2.50 seconds per layer, while the Support Exposure Time is 3.20 seconds per layer, informing the belief that the energy supplied by the imaging unit is in accordance with multiple successive raster masks or bitmaps: a first bitmap encompassing both the support region and the 3D object region and that a second bitmap encompassing the support region alone, thereby providing the support region with additional exposure beyond that received by the 3D object region).

102. Shining 3D's infringement of the '921 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

103. Shining 3D's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

104. Since at least receiving notice of the '921 Patent through service of this Complaint, Shining 3D has continued its infringing conduct with knowledge of the '921 Patent.

105. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283 and 284 for Shining 3D's direct infringement of the '921 Patent.

**COUNT IV**
**(Indirect Infringement of the '921 Patent)**

106. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

107. As set forth above, at least upon service of this Complaint, Shining 3D had knowledge of the '921 Patent and of its infringement thereof.

108. After acquiring knowledge of the '921 Patent, Shining 3D has actively, knowingly, and intentionally induced infringement of the '921 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers, distributors, and end users to meet the elements of at least Claim 1 of the '921 Patent. Such use is consistent with how the Accused Products are described to directly infringe the '921 Patent and how they are intended to be used, as described above and incorporated by reference here. Indeed, there is no way to use the Accused Products to 3D print without invoking the infringing aspects of the Accused Products as described for Count II, and the Accused Products have no purpose other than to 3D print.

109. Shining 3D knew or was willfully blind to the fact that it was inducing others, including customers, authorized resellers, distributors, and end users to infringe the '921 Patent, including at least Claim 1. Shining 3D's inducement includes, without limitation, providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and

online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products in an infringing manner. *See generally* Exhibit 17 (F1 User Manual) (instructing others how to unpack, install, configure, and use the Accused Products), Exhibit 10 (CEL User Manual) (same), Exhibit 33 (Ceramix Nano Instructions for Use) (same), Exhibit 18 (F1 Brochure) (promoting and marketing the Accused Products), Exhibit 19 (CEL Brochure) (same), Exhibit 43 (Ceramix Nano Brochure) (same); *see also* Exhibit 20 (https://www.shining3ddental.com/resource-center?search=&type=201389934202) at 1-2 (showing how Shining 3D operates a "Resource Center" providing case studies, webinars, blogs, and events for the Accused Products); Exhibit 21 (https://www.shining3ddental.com/blog/guide-to-buying-3d-dental-printers) at 5 (promoting and marketing the F1 to users, including features such as "advanced DLP light-curing technology," "a printing accuracy of ± 25μm," an "[o]pen [m]aterial [s]ystem," and that it is "designed specifically for dental clinics"); Exhibit 19 (CEL Brochure) at 2 (promoting and marketing the CEL to users as a "premium-level printing experience," including features such as improved printing speed and a high-performance light panel); Exhibit 30 (https://www.shining3ddental.com/en/solution/ceramix-nano) at 1, 4 (promoting and marketing the Ceramix Nano to users, including features such as "adaptive pneumatic stereolithography," that it is built for "same-hour dentistry," uses "ceramic resin inside . . . [a] capsule," and that it is "[t]ested by [c]linicians"); https://www.youtube.com/watch?v=XSVhYLMv1zc (instructing and encouraging use of the F1 to print 3D-objects, including for dental use); https://www.youtube.com/watch?v=RCo92R9M7w4 (showing the same for the CEL); https://www.youtube.com/watch?v=XRLO-shSVpg (showing the same for the Ceramix Nano); https://www.youtube.com/watch?v=v5CNmM-d8Ho (instructing users how to clean and maintain the HyperClear resin tank to promote its infringing use to print 3D objects).

110. After having acquired knowledge of the '921 Patent, Shining 3D has also contributorily infringed the '921 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the '921 Patent and are not

staple articles suitable for substantial non-infringing use. For example, as discussed above, Shining 3D sells and distributes resin tray assemblies such as Shining 3D's HyperClear and Standard resin tanks, as well as resin capsules specifically for use with the Ceramix Nano, including Shining 3D's LumiCera resin capsule, which are all components that form part of the assemblies and systems claimed in the Asserted Patents specifically for use with Shining 3D printers. Exhibit 13 (https://support.shining3ddental.com/en/support/solutions/articles/60001569623-resin-tank-versions-for-accufab-f1) at 1-2 (showing Shining 3D's Standard (FDAC1) and HyperClear (FDAC1 HyperClear) resin tanks); https://www.youtube.com/watch?v=o1huQoPjg1w (showing the CEL's standard resin tank); Exhibit 9 (https://www.shining3ddental.com/solution/accufab-cel) at 7 (showing that "the CEL supports a Hyper Clear resin tank"); Exhibit 30 (https://www.shining3ddental.com/en/solution/ceramix-nano) at 4 (showing Shining 3D's LumiCera resin capsule for use specifically with the Ceramix Nano).

111. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. When the Accused Products are used as intended, i.e., to 3D print an object, the Accused Products, including these resin tanks and dental materials, embody and are used as components of the apparatus of at least Claim 1, as described above. There is no way to use the Accused Products to 3D print without using the apparatus that infringes at least Claim 1 or the process claims of the '921 Patent, and the Accused Products have no purpose other than to 3D print. Thus, Shining 3D has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components are especially made or adapted for use in infringing the '921 Patent and are not staple articles suitable for substantial non-infringing use.

112. Shining 3D has knowingly and actively aided and abetted, encouraged, and contributed to the direct infringement of the '921 Patent by its customers, resellers, and distributors. Such instructions and encouragement include, but is not limited to, advising third parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the '921 Patent, and by advertising and promoting the use of the Accused Products in an

infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner.

113. Shining 3D's indirect infringement of the '921 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

114. Shining 3D's indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Shining 3D's indirect infringement.

**COUNT V**
**(Direct Infringement of the '580 Patent)**

115. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

116. Shining 3D has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '580 Patent in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and importing into the United States the Accused Products without permission, consent, authorization, or license from SprintRay.

117. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the '580 Patent. Claim 1 recites the following limitations:

> A device for producing a three-dimensional object from a solidifiable material comprising:
>
> > an imaging unit comprising a predetermined number of discrete imaging elements;
> >
> > an imaging unit controller configured to control the discrete imaging elements, wherein each of the discrete imaging elements corresponds to a location on an exposed surface of the solidifiable material and projects electromagnetic radiation based on a corresponding scaled intensity value onto the corresponding location on the exposed surface of the solidifiable material, and each scaled intensity value is based on a corresponding compensation light intensity value and a degree of overlap between the location on the exposed surface of the solidifiable material to which the scaled intensity value corresponds and a graphic depicting the three-dimensional object.

118. The Accused Products include, without limitation, a device for producing a three-dimensional object from a solidifiable material as claimed in the '580 Patent. The Accused Products include the F1, CEL, and Ceramix Nano, which are devices for producing three-dimensional objects from solidifiable material. *See* https://www.youtube.com/watch?v=XSVhYLMv1zc (showing that the F1 is a device for producing three-dimensional objects from solidifiable material); https://www.youtube.com/watch?v=RCo92R9M7w4 (showing that the CEL is a device for producing three-dimensional objects from solidifiable material); https://www.youtube.com/watch?v=XRLO-shSVpg (showing that the Ceramix Nano is a device for producing three-dimensional objects from solidifiable material).

119. The Accused Products include an imaging unit comprising a predetermined number of discrete imaging elements. The F1 includes an imaging unit comprising an LED DLP light engine and a 1920-pixel by 1080-pixel LCD screen, the CEL includes an imaging unit comprising a 400-405 nm Chip-on-Board (COB) UV-LED and a 5760-pixel x 3600-pixel LCD screen, and the Ceramix Nano includes an imaging unit comprising an LED DLP light engine having a 640 x 360 pixel image resolution and a projected pixel size of 0.05 mm, providing a predetermined number of discrete imaging elements corresponding to the 640 x 360 pixel array. *See* Exhibit 11 at 3 (https://instituteofdigitaldentistry.com/podcast/s03-e09-shining-3d-has-done-the-impossible-from-bad-to-market-leader-in-5-years/) (showing that the F1 is a DLP printer); Exhibit 17 (F1 User Manual) at 17 (showing that the imaging unit is a DLP light engine including a 405 nm UV-LED and a digital micromirror device having a 1920 pixel x 1080 pixel discrete mirror array); Exhibit 10 (CEL User Manual) at 13, 16 (showing that the CEL uses a 400-405 nm COB UV-LED positioned under an LCD screen with a 5760 pixel x 3600 pixel array); Exhibit 33 (Ceramix Nano Instructions for Use) at 34 (showing that the imaging unit is a DLP light engine having a 640 pixel by 360 pixel array).

120. The Accused Products include an imaging unit controller in the form of an integrated circuit board configured to control the discrete imaging elements through the integrated circuit board's wired connection to the imaging unit. *See* https://www.youtube.com/watch?v=HoYG3sLd9YM (showing the F1's imaging unit, the DLP light engine and LCD screen, and imaging unit controller, an

integrated circuit board electrically connected to and configured to control the discrete imaging elements of the imaging unit); https://www.youtube.com/watch?v=HoYG3sLd9YM (showing the CEL's imaging unit, the COB UV LED and LCD screen, and imaging unit controller, an integrated circuit board electrically connected to and configured to control the discrete imaging elements of the imaging unit).

121. In the Accused Products, each of the discrete imaging elements corresponds to a location on an exposed surface of the solidifiable material and projects electromagnetic radiation onto that corresponding location. This results in a visible pattern of electromagnetic radiation on the exposed surface of the solidifiable material. Exhibit 41 (https://support.shining3ddental.com/en/support/solutions/articles/60001641272-light-intensity-correction-function-f1-side-optical-power-meter-adjustable-) (showing how, in the F1, the plurality of discrete imaging elements project electromagnetic radiation in a pattern onto corresponding locations of the glass substrate, which in turn correspond to locations on an exposed surface of the solidifiable material when the resin tank filled with photosensitive resin is placed on top of the glass substrate during printing); *see* https://www.youtube.com/watch?v=odXbL593hVA&t=7s (showing the same in the CEL).

122. Each of the discrete imaging elements in the Accused Products projects electromagnetic radiation based on a corresponding scaled intensity value. Each scaled intensity value is based on (1) a corresponding compensation light intensity value (i.e., a location-based correction value for the pixel) and (2) a degree of overlap between the location on the exposed surface of the solidifiable material to which the scaled intensity value corresponds (i.e., the pixel) and a graphic depicting the three-dimensional object (i.e., the object graphic).

123. SprintRay is informed and believes that in the Accused Products, the corresponding compensation light intensity value is a pre-assigned correction value based on the corresponding location of the pixel on an exposed surface of the solidifiable material. Specifically, as described above, SprintRay is informed and believes that the Accused Products utilize a two-step verification and calibration process to measure light intensities at various locations of the exposed surface of the

solidifiable material and scale the light intensities at the discrete imaging elements based on those measurements by applying a compensation mask.

124. SprintRay is informed and believes that the Accused Products measure the degree of overlap between the location on the exposed surface of the solidifiable material to which the scaled intensity value corresponds (i.e., the pixel) and a graphic depicting the three-dimensional object (i.e., the object mask), and the imaging unit controller scales the intensity value of the electromagnetic radiation projected by the discrete imaging elements based on (a) this degree of overlap and (b) the corresponding compensation light intensity value determined through the measurement and calibration process described herein.

125. Shining 3D's infringement of the '580 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

126. Shining 3D's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

127. Since at least receiving notice of the '580 Patent through service of this Complaint, Shining 3D has continued its infringing conduct with knowledge of the '580 Patent.

128. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283 and 284 for Shining 3D's direct infringement of the '580 Patent.

**COUNT VI**
**(Indirect Infringement of the '580 Patent)**

129. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

130. As set forth above, at least upon service of this Complaint, Shining 3D had knowledge of the '580 Patent and of its infringement thereof.

131. After acquiring knowledge of the '580 Patent, Shining 3D has actively, knowingly, and intentionally induced infringement of the '580 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers,

distributors, and end users to meet the elements of at least Claim 1 of the '580 Patent. Such use is consistent with how the Accused Products are described to directly infringe the '580 Patent and how they are intended to be used, as described above and incorporated by reference here. Indeed, there is no way to use the Accused Products to 3D print without invoking the infringing aspects of the Accused Products as described for Count II, and the Accused Products have no purpose other than to 3D print.

132. Shining 3D knew or was willfully blind to the fact that it was inducing others, including customers, authorized resellers, distributors, and end users to infringe the '580 Patent, including at least Claim 1. Shining 3D's inducement includes, without limitation, providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products in an infringing manner. *See generally* Exhibit 17 (F1 User Manual) (instructing others how to unpack, install, configure, and use the Accused Products), Exhibit 10 (CEL User Manual) (same), Exhibit 33 (Ceramix Nano Instructions for Use) (same), Exhibit 18 (F1 Brochure) (promoting and marketing the Accused Products), Exhibit 19 (CEL Brochure) (same), Exhibit 43 (Ceramix Nano Brochure) (same); *see also* Exhibit 20 (https://www.shining3ddental.com/resource-center?search=&type=201389934202) at 1-2 (showing how Shining 3D operates a "Resource Center" providing case studies, webinars, blogs, and events for the Accused Products); Exhibit 21 (https://www.shining3ddental.com/blog/guide-to-buying-3d-dental-printers) at 5 (promoting and marketing the F1 to users, including features such as "advanced DLP light-curing technology," "a printing accuracy of ± 25μm," an "[o]pen [m]aterial [s]ystem," and that it is "designed specifically for dental clinics"); Exhibit 19 (CEL Brochure) at 2 (promoting and marketing the CEL to users as a "premium-level printing experience," including features such as improved printing speed and a high-performance light panel); Exhibit 30 (https://www.shining3ddental.com/en/solution/ceramix-nano) at 1, 4 (promoting and marketing the Ceramix Nano to users, including features such as "adaptive pneumatic stereolithography," that it is built for "same-hour dentistry," uses "ceramic resin inside . . . [a] capsule," and that it is "[t]ested by [c]linicians"); https://www.youtube.com/watch?v=XSVhYLMv1zc (instructing and encouraging use of

the F1 to print 3D-objects, including for dental use); https://www.youtube.com/watch?v=RCo92R9M7w4 (showing the same for the CEL); https://www.youtube.com/watch?v=XRLO-shSVpg (showing the same for the Ceramix Nano); https://www.youtube.com/watch?v=v5CNmM-d8Ho (instructing users how to clean and maintain the HyperClear resin tank to promote its infringing use to print 3D objects).

133. After having acquired knowledge of the ’580 Patent, Shining 3D has also contributorily infringed the ’580 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the ’580 Patent and are not staple articles suitable for substantial non-infringing use. For example, as discussed above, Shining 3D sells and distributes resin tray assemblies such as Shining 3D’s HyperClear and Standard resin tanks, as well as resin capsules specifically for use with the Ceramix Nano, including Shining 3D’s LumiCera resin capsule, which are all components that form part of the assemblies and systems claimed in the Asserted Patents specifically for use with Shining 3D printers. Exhibit 13 (https://support.shining3ddental.com/en/support/solutions/articles/60001569623-resin-tank-versions-for-accufab-f1) at 1-2 (showing Shining 3D’s Standard (FDAC1) and HyperClear (FDAC1 HyperClear) resin tanks); https://www.youtube.com/watch?v=o1huQoPjg1w (showing the CEL’s standard resin tank); Exhibit 9 (https://www.shining3ddental.com/solution/accufab-cel) at 7 (showing that “the CEL supports a Hyper Clear resin tank”); Exhibit 30 (https://www.shining3ddental.com/en/solution/ceramix-nano) at 4 (showing Shining 3D’s LumiCera resin capsule for use specifically with the Ceramix Nano).

134. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. When the Accused Products are used as intended, i.e., to 3D print an object, the Accused Products, including these resin tanks and dental materials, embody and are used as components of the apparatus of at least Claim 1, as described above. There is no way to use the Accused Products to 3D print without using the apparatus that infringes at least Claim 1 or the process claims of the ’580 Patent, and the Accused Products have no

purpose other than to 3D print. Thus, Shining 3D has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components are especially made or adapted for use in infringing the ’580 Patent and are not staple articles suitable for substantial non-infringing use.

135. Shining 3D has knowingly and actively aided and abetted, encouraged, and contributed to the direct infringement of the ’580 Patent by its customers, resellers, and distributors. Such instructions and encouragement include, but is not limited to, advising third parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the ’580 Patent, and by advertising and promoting the use of the Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner.

136. Shining 3D’s indirect infringement of the ’580 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

137. Shining 3D’s indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Shining 3D’s indirect infringement.

**COUNT VII**
**(Direct Infringement of the ’143 Patent)**

138. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

139. Shining 3D has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the ’143 Patent in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and importing into the United States the Accused Products without permission, consent, authorization, or license from SprintRay.

140. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the '143 Patent. Claim 1 recites the following limitations:

A method for producing a three-dimensional object, comprising:

> supplying solidification energy to a portion of a solidifiable material corresponding to a cross-section of the three-dimensional object in accordance with a first bitmap mask; and
>
> supplying solidification energy to the portion of the solidifiable material corresponding to the cross-section of the three-dimensional object in accordance with a second bitmap mask, wherein the second bitmap mask is a partial mask within the first bitmap mask.

141. The Accused Products perform a process for producing a three-dimensional object by selectively solidifying a material, as described below. *See* https://www.youtube.com/watch?v=XSVhYLMv1zc (showing that the F1 performs a process for producing three-dimensional objects by selectively solidifying a material); https://www.youtube.com/watch?v=RCo92R9M7w4 (showing that the CEL performs a process for producing three-dimensional objects by selectively solidifying a material); https://www.youtube.com/watch?v=XRLO-shSVpg (showing that the Ceramix Nano performs a process for producing three-dimensional objects by selectively solidifying a material).

142. As discussed above, SprintRay is informed and believes based on publicly available information that the Accused Products supply solidification energy to a portion of a solidifiable material corresponding to a cross-section of the three-dimensional object to be printed in accordance with a first and second bitmap mask.

143. Further, SprintRay is informed and believes that the Accused Products supply solidification energy to the portion of the solidifiable material corresponding to the cross-section of the three-dimensional object in accordance with a second bitmap mask, wherein the second bitmap mask is a partial mask within the first bitmap mask. As shown below, for a certain material profile, AccuWare specifies a Fill Exposure Time of 2.50 seconds and a Boundary Exposure Time of 2.50 seconds, while specifying a longer Support Exposure Time of 3.20 seconds for the same layer. SprintRay is therefore informed and believes that both the object region and the support region receive solidification energy

supplied in accordance with a first bitmap mask for 2.50 seconds, while only the support region receives additional solidification energy supplied in accordance with a second bitmap mask for the remaining 0.70 seconds, resulting in a total exposure time of 3.20 seconds for the support region. Thus, the support region receives all solidification energy supplied in accordance with the first bitmap mask plus additional solidification energy supplied in accordance with the second bitmap mask, whereas the object region receives only the solidification energy supplied in accordance with the first bitmap mask. Accordingly, SprintRay is informed and believes that every pixel corresponding to the second bitmap mask is also encompassed by the first bitmap mask, such that the second bitmap mask is a partial mask within the first bitmap mask corresponding only to the support region.




**Accuware software - how to work with a new resin**

*See* https://www.youtube.com/watch?v=M_BzmzEJlGs (showing that, in AccuWare, the Fill Exposure Time and Boundary Exposure Time are both 2.50 seconds per layer, while the Support Exposure Time is 3.20 seconds per layer, informing the belief that the second bitmap mask is a partial mask within the first bitmap mask).

144. Shining 3D's infringement of the '143 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

145. Shining 3D's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

146. Since at least receiving notice of the '143 Patent through service of this Complaint, Shining 3D has continued its infringing conduct with knowledge of the '143 Patent.

147. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283 and 284 for Shining 3D's direct infringement of the '143 Patent.

## COUNT VIII
## (Indirect Infringement of the '143 Patent)

148. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

149. As set forth above, at least upon service of this Complaint, Shining 3D had knowledge of the '143 Patent and of its infringement thereof.

150. After acquiring knowledge of the '143 Patent, Shining 3D has actively, knowingly, and intentionally induced infringement of the '143 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers, distributors, and end users to meet the elements of at least Claim 1 of the '143 Patent by performing the claimed method using the Accused Products. Whenever the Accused Products are used to 3D print an object, they necessarily perform the method of Claim 1 as described for Count VII. There is no way to use the Accused Products to 3D print without performing the method that infringes Claim 1, and the Accused Products have no purpose other than to 3D print.

151. Shining 3D knew or was willfully blind to the fact that it was inducing others, including customers, authorized resellers, distributors, and end users to infringe the '143 Patent, including at least Claim 1. Shining 3D's inducement includes, without limitation, providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and

online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products in an infringing manner. *See generally* Exhibit 17 (F1 User Manual) (instructing others how to unpack, install, configure, and use the Accused Products), Exhibit 10 (CEL User Manual) (same), Exhibit 33 (Ceramix Nano Instructions for Use) (same), Exhibit 18 (F1 Brochure) (promoting and marketing the Accused Products), Exhibit 19 (CEL Brochure) (same), Exhibit 43 (Ceramix Nano Brochure) (same); *see also* Exhibit 20 (https://www.shining3ddental.com/resource-center?search=&type=201389934202) at 1-2 (showing how Shining 3D operates a "Resource Center" providing case studies, webinars, blogs, and events for the Accused Products); Exhibit 21 (https://www.shining3ddental.com/blog/guide-to-buying-3d-dental-printers) at 5 (promoting and marketing the F1 to users, including features such as "advanced DLP light-curing technology," "a printing accuracy of ± 25µm," an "[o]pen [m]aterial [s]ystem," and that it is "designed specifically for dental clinics"); Exhibit 19 (CEL Brochure) at 2 (promoting and marketing the CEL to users as a "premium-level printing experience," including features such as improved printing speed and a high-performance light panel); Exhibit 30 (https://www.shining3ddental.com/en/solution/ceramix-nano) at 1, 4 (promoting and marketing the Ceramix Nano to users, including features such as "advanced pneumatic stereolithography," that it is built for "same-hour dentistry," uses "ceramic resin inside . . . [a] capsule," and that it is "[t]ested by [c]linicians"); https://www.youtube.com/watch?v=XSVhYLMv1zc (instructing and encouraging use of the F1 to print 3D-objects, including for dental use); https://www.youtube.com/watch?v=RCo92R9M7w4 (showing the same for the CEL); https://www.youtube.com/watch?v=XRLO-shSVpg (showing the same for the Ceramix Nano); https://www.youtube.com/watch?v=v5CNmM-d8Ho (instructing users how to clean and maintain the HyperClear resin tank to promote its infringing use to print 3D objects).

152. After having acquired knowledge of the '143 Patent, Shining 3D has also contributorily infringed the '143 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the '143 Patent and are not

staple articles suitable for substantial non-infringing use. For example, as discussed above, Shining 3D sells and distributes resin tray assemblies such as Shining 3D's HyperClear and Standard resin tanks, as well as resin capsules specifically for use with the Ceramix Nano, including Shining 3D's LumiCera resin capsule, which are all components that form part of the assemblies and systems claimed in the Asserted Patents specifically for use with Shining 3D printers. Exhibit 13 (https://support.shining3ddental.com/en/support/solutions/articles/60001569623-resin-tank-versions-for-accufab-f1) at 1-2 (showing Shining 3D's Standard (FDAC1) and HyperClear (FDAC1 HyperClear) resin tanks); https://www.youtube.com/watch?v=o1huQoPjg1w (showing the CEL's standard resin tank); Exhibit 9 (https://www.shining3ddental.com/solution/accufab-cel) at 7 (showing that "the CEL supports a Hyper Clear resin tank"); Exhibit 30 (https://www.shining3ddental.com/en/solution/ceramix-nano) at 4 (showing Shining 3D's LumiCera resin capsule for use specifically with the Ceramix Nano).

153. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. Whenever the Accused Products are used as intended, i.e., to 3D print an object, the Accused Products, including these resin tanks and dental materials, necessarily perform the method of Claim 1, as described in Count VII. There is no way to use the Accused Products to 3D print without performing the method that infringes Claim 1, and the Accused Products have no purpose other than to 3D print. Thus, Shining 3D has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components are especially made or adapted for use in infringing the '143 Patent and are not staple articles suitable for substantial non-infringing use.

154. Shining 3D has knowingly and actively aided and abetted, encouraged, and contributed to the direct infringement of the '143 Patent by its customers, resellers, and distributors. Such instructions and encouragement include, but is not limited to, advising third parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the '143 Patent, and by advertising and promoting the use of the Accused Products in an

infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner.

155. Shining 3D's indirect infringement of the '143 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

156. Shining 3D's indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Shining 3D's indirect infringement.

**COUNT IX**
**(Direct Infringement of the '355 Patent)**

157. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

158. Shining 3D has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '355 Patent in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and importing into the United States the Accused Products without permission, consent, authorization, or license from SprintRay.

159. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the '355 Patent. Claim 1 recites the following limitations:

> A multi-layer assembly for making a three-dimensional object by solidifying a solidifiable material, comprising:
>
> > a rigid or semi-rigid solidification substrate assembly comprising a frame and a rigid or semi-rigid translucent solidification substrate disposed in the frame;
> >
> > a film assembly, wherein the rigid or semi-rigid solidification substrate assembly is connected to the film assembly, and the film assembly includes at least one frame and a film disposed in the at least one frame.

160. The Accused Products include the F1 and CEL with HyperClear or Standard resin trays, which together comprise a multi-layer assembly for making a 3D object by solidifying a solidifiable

material, including resin, as claimed in the ’355 Patent. The Accused Products include a rigid or semi-rigid solidification substrate assembly comprising a support frame mounted to the base of the printer, on which a rigid or semi-rigid translucent substrate (i.e., a glass plate) is positioned and secured.




AccuFab-F1 | High-Performance Dental 3D Printing Redefined




**Platform Levelling for AccuFab-CEL**

*See* https://www.youtube.com/watch?v=9Id-5AMVhG8, https://www.youtube.com/watch?v=lxYOzkUHPQY (showing the Accused Products' support frame on which the glass plate, the rigid or semi-rigid translucent substrate, is positioned and secured).

161. The Accused Products further include a resin tank comprising a film assembly that is mounted to the support frame and disposed above the substrate. The film assembly includes a frame and at least one film disposed within the frame, including a permeable release film. The film is secured within the frame and is tensioned across the bottom of the resin tank.




**Film Changing for Standard Resin Tank For AccuFab-CEL**




**AccuFab-F1 | High-Performance Dental 3D Printing Redefined**

*See* https://www.youtube.com/watch?v=o1huQoPjg1w, https://www.youtube.com/watch?v=9Id-5AMVhG8 (showing how, in the case of the Standard resin tanks, the film assembly includes at least one frame and a film, the permeable release film, disposed in the frame).




*See* https://www.youtube.com/watch?v=v5CNmM-d8Ho (showing the HyperClear resin tank which is the film assembly including a frame and a permeable release film tensioned across the bottom of the resin tank).

162. In the Accused Products, the film assembly is connected to the substrate assembly through the support frame such that the tensioned films are positioned above the substrate and form a solidification interface for the resin during printing.







AccuFab-F1 | High-Performance Dental 3D Printing Redefined


AccuFab-F1 | High-Performance Dental 3D Printing Redefined
SHINING3D Dental
9.4K subscribers
Subscribe
38
Share
Save


Film assembly
Substrate assembly
The AccuFab-CEL Dental 3D Printer: Higher, Faster, Easier




The AccuFab-CEL Dental 3D Printer: Higher, Faster, Easier




The AccuFab-CEL Dental 3D Printer: Higher, Faster, Easier

*See* https://www.youtube.com/watch?v=v5CNmM-d8Ho, https://www.youtube.com/watch?v=RCo92R9M7w4 (showing the resin tray (film assembly) connected to the glass plate (substrate assembly) through the support frame such that the tensioned films are positioned above the substrate and form a solidification interface for the resin during printing).

163. Shining 3D's infringement includes, without limitation, providing and selling resin trays assemblies, substrate assemblies, and film assemblies that satisfy the structural and functional limitations of at least Claim 1 of the '355 Patent.

164. Shining 3D's infringement of the '355 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

165. Shining 3D's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

166. Since at least receiving notice of the '355 Patent through service of this Complaint, Shining 3D has continued its infringing conduct with knowledge of the '355 Patent.

167. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Shining 3D's direct infringement of the '355 Patent.

## COUNT X
**(Indirect Infringement of the '355 Patent)**

168. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

169. As set forth above, at least upon service of this Complaint, Shining 3D had knowledge of the '355 Patent and of its infringement thereof.

170. After acquiring knowledge of the '355 Patent, Shining 3D has actively, knowingly, and intentionally induced infringement of the '355 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers, distributors, and end users to meet the elements of at least Claim 1 of the '355 Patent. Such use is

consistent with how the Accused Products are described to directly infringe the ’355 Patent and how they are intended to be used, as described above and incorporated by reference here.

171. Shining 3D knew or was willfully blind to the fact that it was inducing others, including customers, authorized resellers, distributors, and end users, to infringe the ’355 Patent, including at least Claim 1. Shining 3D’s inducement includes, without limitation, providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products in an infringing manner. *See generally* Exhibit 17 (F1 User Manual) (instructing others how to unpack, install, configure, and use the Accused Products), Exhibit 10 (CEL User Manual) (same), Exhibit 18 (F1 Brochure) (promoting and marketing the Accused Products), Exhibit 19 (CEL Brochure) (same); *see also* Exhibit 20 (https://www.shining3ddental.com/resource-center?search=&type=201389934202) at 1-2 (showing how Shining 3D operates a “Resource Center” providing case studies, webinars, blogs, and events for the Accused Products); Exhibit 21 (https://www.shining3ddental.com/blog/guide-to-buying-3d-dental-printers) at 5 (promoting and marketing the F1 to users, including features such as “advanced DLP light-curing technology,” “a printing accuracy of ± 25μm,” an “[o]pen [m]aterial [s]ystem,” and that it is “designed specifically for dental clinics”); Exhibit 19 (CEL Brochure) at 2 (promoting and marketing the CEL to users as a “premium-level printing experience,” including features such as improved printing speed and a high-performance light panel); https://www.youtube.com/watch?v=XSVhYLMv1zc (instructing and encouraging use of the F1 to print 3D-objects, including for dental use); https://www.youtube.com/watch?v=RCo92R9M7w4 (demonstrating and encouraging use of the CEL to print 3D-objects, including for dental use); https://www.youtube.com/watch?v=v5CNmM-d8Ho (instructing users how to clean and maintain the HyperClear resin tank to promote its infringing use to print 3D objects).

172. Beyond making the Accused Products and general product documentation available, Shining 3D affirmatively instructs, promotes, and encourages customers to, for example, operate the accused AccuFab-CEL printer together with the HyperClear resin tank in the configuration alleged to

infringe the ’355 Patent. As alleged above, Shining 3D provides customers with AccuWare software and instructions for preparing, configuring, slicing, and initiating printing operations using the Accused Products. *See* Exhibit 32 (Download AccuWare, Shining 3D Dental Support Center). As further alleged above, Shining 3D expressly recommends using the AccuFab-CEL printer with the HyperClear resin tank to fabricate dental splints. *See* Exhibits 37, 38 (Splint Hard Resin Application Guide, Shining 3D Dental Support Center). The Splint Hard Resin Application Guide provides specific instructions for carrying out that printing workflow, including transferring a splint design into AccuWare, selecting the AccuFab-CEL printer, and initiating Shining 3D’s “one-click” printing functionality, which automatically performs model layout, support generation, slicing, and submission of the printing job. The guide specifically recommends this printing functionality when using the HyperClear resin tank. By directing customers to print dental splints using the AccuFab-CEL printer with the HyperClear resin tank, Shining 3D affirmatively encourages customers to use the accused configuration alleged to satisfy at least claim 1 of the ’355 Patent, including the solidification substrate, film assembly, and associated peeling structures identified in the direct-infringement allegations above. The structural and operational characteristics of those components are further alleged in the preceding paragraphs. The guide’s instructions encourage use of the accused configuration incorporating those components. On information and belief, after receiving actual notice of the ’355 Patent and the conduct alleged to infringe it, Shining 3D continued to provide and promote these instructions with knowledge of SprintRay’s infringement allegations and with the specific intent to encourage customers to engage in the acts of direct infringement alleged herein.

173. After having acquired knowledge of the ’355 Patent, Shining 3D has also contributorily infringed the ’355 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the ’355 Patent and are not staple articles suitable for substantial non-infringing use. For example, as discussed above, Shining 3D sells and distributes resin tray assemblies such as Shining 3D’s HyperClear and Standard resin trays, components that form part of the assemblies and systems claimed in the Asserted Patents specifically

for use with Shining 3D printers. Exhibit 13 (https://support.shining3ddental.com/en/support/solutions/articles/60001569623-resin-tank-versions-for-accufab-f1) at 1-2 (showing Shining 3D's Standard (FDAC1) and HyperClear (FDAC1 HyperClear) resin tanks); https://www.youtube.com/watch?v=o1huQoPjg1w (showing the CEL's standard resin tank); Exhibit 9 (https://www.shining3ddental.com/solution/accufab-cel) at 7 (showing that "the CEL supports a Hyper Clear resin tank").

174. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. When the Accused Products are used as intended, i.e., to 3D print an object, the Accused Products, including these build trays and dental materials, embody and are used as components of the apparatus of at least Claim 1, as described above. There is no way to use the Accused Products to 3D print without using the apparatus that infringes at least Claim 1, and the Accused Products have no purpose other than to 3D print. Thus, Shining 3D has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components are especially made or adapted for use in infringing the '355 Patent and are not staple articles suitable for substantial non-infringing use.

175. Shining 3D has knowingly and actively aided and abetted, encouraged, and contributed to its customers', resellers', and distributors' direct infringement of the '355 Patent. Such instructions and encouragement include, but is not limited to, advising third parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the '355 Patent, and by advertising and promoting the use of the Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner.

176. Shining 3D's indirect infringement of the '355 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

177. Shining 3D's indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

178. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Shining 3D's indirect infringement.

**COUNT XI**
**(Direct Infringement of the '910 Patent)**

179. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

180. Shining 3D has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the '910 Patent in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and importing into the United States the Accused Products without permission, consent, authorization, or license from SprintRay.

181. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the '910 Patent. Claim 1 recites the following limitations:

> A multi-layer system for making a three-dimensional object by solidifying a solidifiable material, comprising:
>
> > a rigid or semi-rigid solidification substrate assembly comprising a frame and a rigid or semi-rigid translucent solidification substrate disposed in the frame, wherein the rigid or semi-rigid translucent solidification substrate comprises a first surface and a second surface opposite the first surface;
> >
> > a film assembly including at least one film frame and at least one film disposed in the at least one film frame, wherein the at least one film comprises a first surface and a second surface opposite the first surface of the at least one film, wherein the first surface of the at least one film is adjacent to and in non-adhesive contact with the first surface of the rigid or semi-rigid translucent solidification substrate.

182. The Accused Products include the F1 and CEL with HyperClear or Standard resin trays, which together comprise a multi-layer assembly for making a 3D object by solidifying a solidifiable material, including resin, as claimed in the '910 Patent. The Accused Products include a rigid or semi-rigid solidification substrate assembly comprising a support frame mounted to the base of the printer,

on which a rigid or semi-rigid translucent substrate (i.e., a glass plate and protective film/screen protector) is positioned and secured. *See* https://www.youtube.com/watch?v=9Id-5AMVhG8, https://www.youtube.com/watch?v=lxYOzkUHPQY (showing the Accused Products' support frame on which the glass plate and protective film/screen protector, the rigid or semi-rigid translucent substrate, is positioned and secured).

183. The rigid or semi-rigid translucent substrate (i.e., glass plate and protective film/screen protector) of the Accused Products comprises a first surface, a protective film or screen protector, and a second surface, the glass surface, opposite the protective film disposed within the frame.




Exhibit 17 (F1 User Manual) at 40-41 (showing how the glass plate comprises multiple surfaces: a top surface, which is the second surface, underneath, or opposite, the protective film, which is the first surface).






Exhibit 10 (CEL User Manual) at 12 (showing how the glass plate comprises multiple surfaces: a top surface, which is the second surface, underneath, or opposite, the screen protector, which is the first surface).

184. The Accused Products further include a resin tank comprising a film assembly that is mounted to the support frame and disposed above the substrate. The film assembly includes a film frame and at least one film disposed within the frame, including a permeable release film (in the case of the Standard and HyperClear tanks) and, additionally, a lower scattering film (in the case of HyperClear).




**Film Changing for Standard Resin Tank For AccuFab-CEL**




AccuFab-F1 | High-Performance Dental 3D Printing Redefined

*See* https://www.youtube.com/watch?v=o1huQoPjg1w, https://www.youtube.com/watch?v=9Id-5AMVhG8 (showing how, in the case of the Standard resin tanks, the film assembly includes at least one frame and a film, the permeable release film, disposed in the frame).




How to Clean the HyperClear Resin Tank?
SHINING3D Dental
9.4K subscribers
Subscribe
2
Share
Save




*See* https://www.youtube.com/watch?v=v5CNmM-d8Ho (showing the HyperClear resin tank which is the film assembly including a frame, a top, permeable release film and a lower scattering film with four holes, allowing air into the gap between the two films, tensioned across the bottom of the resin tank).

185. In the case of the Standard resin tanks, the single permeable release film is at least one film disposed in the frame comprising a first surface, the bottom surface of the permeable release film, and a second surface above, or opposite, the first surface of the permeable release film—the top of the permeable release film. The bottom of the permeable release film is in non-adhesive contact with the first surface of the rigid or semi-rigid translucent solidification substrate, which is the screen protective film/screen protector.




AccuFab-F1 | High-Performance Dental 3D Printing Redefined




AccuFab-F1 | High-Performance Dental 3D Printing Redefined




Film Changing for Standard Resin Tank For AccuFab-CEL




Film Changing for Standard Resin Tank For AccuFab-CEL

*See* https://www.youtube.com/watch?v=o1huQoPjg1w (showing how, in the case of the Standard resin tanks, the bottom surface of the permeable release film, the first surface of the film, is opposite the top of the permeable release film, which is the second surface of the film, and is disposed in the frame).

186. In the case of the HyperClear resin tank, the lower scattering film is at least one film disposed in the frame comprising a first surface, the bottom surface of the lower scattering film, and a second surface above, or opposite, the first surface of the lower scattering film—the top of the lower scattering film. The bottom of the lower scattering film is in non-adhesive contact with the first surface of the rigid or semi-rigid translucent solidification substrate, which is the screen protective film/screen protector.




Demonstrative illustration created to show how, in the case of HyperClear, the bottom surface of the lower scattering film of the Accused Products is disposed in the frame and opposite the top of the lower scattering film, which is the second surface of the film, and that the bottom of the lower scattering film is in non-adhesive contact with the first surface of the rigid or semi-rigid translucent solidification substrate, which is the screen protective film.




AccuFab-F1 | Advanced Functions for High-Precision Dental 3D Printing

SHINING3D Dental 9.4K subscribers Subscribe 20 Share Ask Save




Platform Levelling for AccuFab-CEL

*See* https://www.youtube.com/watch?v=Hw8SiVKGtHY, https://www.youtube.com/watch?v=lxYOzkUHPQY (showing how, in the Accused Products, the film assembly is connected to the substrate assembly, positioning the films above the substrate and forming a non-adhesive contact between the screen protective film/screen protector and the bottom surface of the bottom-most layer of a resin tank).

187. In the Accused Products, the film assembly is connected to the substrate assembly forming a multi-layer assembly for making a three-dimensional object by solidifying a solidifiable material.






AccuFab-F1 | High-Performance Dental 3D Printing Redefined



AccuFab-F1 | High-Performance Dental 3D Printing Redefined

SHINING3D Dental
9.4K subscribers
Subscribe
38
Share
Save



The AccuFab-CEL Dental 3D Printer: Higher, Faster, Easier




The AccuFab-CEL Dental 3D Printer: Higher, Faster, Easier




The AccuFab-CEL Dental 3D Printer: Higher, Faster, Easier

*See* https://www.youtube.com/watch?v=v5CNmM-d8Ho, https://www.youtube.com/watch?v=RCo92R9M7w4 (showing the resin tray (film assembly) connected to the substrate assembly (glass plate and screen protective film) such that the tensioned films are positioned above the substrate and form a multi-layer assembly solidifying a solidifiable material).

188. Shining 3D's infringement includes, without limitation, providing and selling resin trays assemblies, substrate assemblies, and film assemblies that satisfy the structural and functional limitations of at least Claim 1 of the '910 Patent.

189. Shining 3D's infringement of the '910 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

190. Shining 3D's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

191. Since at least receiving notice of the ’910 Patent through service of this Complaint, Shining 3D has continued its infringing conduct with knowledge of the ’910 Patent.

192. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Shining 3D’s direct infringement of the ’910 Patent.

**COUNT XII**
**(Indirect Infringement of the ’910 Patent)**

193. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

194. As set forth above, at least upon service of this Complaint, Shining 3D had knowledge of the ’910 Patent and of its infringement thereof.

195. After acquiring knowledge of the ’910 Patent, Shining 3D has actively, knowingly, and intentionally induced infringement of the ’910 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers, distributors, and end users to meet the elements of at least Claim 1 of the ’910 Patent. Such use is consistent with how the Accused Products are described to directly infringe the ’910 Patent and how they are intended to be used, as described above and incorporated by reference here.

196. Shining 3D knew or was willfully blind to the fact that it was inducing others, including customers, authorized resellers, distributors, and end users, to infringe the ’910 Patent, including at least Claim 1. Shining 3D’s inducement includes, without limitation, providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products in an infringing manner. *See generally* Exhibit 17 (F1 User Manual) (instructing others how to unpack, install, configure, and use the Accused Products), Exhibit 10 (CEL User Manual) (same), Exhibit 18 (F1 Brochure) (promoting and marketing the Accused Products), Exhibit 19 (CEL Brochure) (same); *see also* Exhibit 20 (https://www.shining3ddental.com/resource-center?search=&type=201389934202) at 1-2 (showing how Shining 3D operates a “Resource Center” providing case studies, webinars, blogs, and events for the Accused Products); Exhibit 21

(https://www.shining3ddental.com/blog/guide-to-buying-3d-dental-printers) at 5 (promoting and marketing the F1 to users, including features such as "advanced DLP light-curing technology," "a printing accuracy of ± 25μm," an "[o]pen [m]aterial [s]ystem," and that it is "designed specifically for dental clinics"); Exhibit 19 (CEL Brochure) at 2 (promoting and marketing the CEL to users as a "premium-level printing experience," including features such as improved printing speed and a high-performance light panel); https://www.youtube.com/watch?v=XSVhYLMv1zc (instructing and encouraging use of the F1 to print 3D-objects, including for dental use); https://www.youtube.com/watch?v=RCo92R9M7w4 (demonstrating and encouraging use of the CEL to print 3D-objects, including for dental use); https://www.youtube.com/watch?v=v5CNmM-d8Ho (instructing users how to clean and maintain the HyperClear resin tank to promote its infringing use to print 3D objects).

197. Beyond making the Accused Products and general product documentation available, Shining 3D affirmatively instructs, promotes, and encourages customers to operate the accused AccuFab-CEL printer together with the HyperClear resin tank in the configuration alleged to infringe the '910 Patent. As alleged above, Shining 3D provides customers with AccuWare software and instructions for preparing, configuring, slicing, and initiating printing operations using the Accused Products. *See* Exhibit 32 (Download AccuWare, Shining 3D Dental Support Center). As further alleged above, Shining 3D expressly recommends using the AccuFab-CEL printer with the HyperClear resin tank to fabricate dental splints and provides specific instructions for carrying out that printing workflow. *See* Exhibits 37, 38 (Splint Hard Resin Application Guide, Shining 3D Dental Support Center). The guide provides specific instructions for carrying out that printing workflow, including transferring a splint design into AccuWare, selecting the appropriate printer, and initiating Shining 3D's "one-click" printing functionality, which automatically performs model layout, support generation, slicing, and submission of the printing job. The guide specifically recommends this functionality when using the HyperClear resin tank. By directing customers to print dental splints using the AccuFab-CEL printer with the HyperClear resin tank, Shining 3D affirmatively encourages customers to use the accused configuration alleged to satisfy at least claim 1 of the '910 Patent, including the solidification substrate,

film assembly, and their claimed structural relationship, as identified in the direct-infringement allegations above. The structural characteristics of those components, including the alleged relationship between the film assembly and solidification substrate, are further addressed in the preceding direct-infringement allegations; the guide's instructions encourage use of the accused configuration incorporating those components. After receiving actual notice of the '910 Patent and the conduct alleged to infringe it, Shining 3D continued to provide and promote these instructions with knowledge of SprintRay's infringement allegations and with the specific intent to encourage customers to engage in the acts of direct infringement alleged herein.

198. After having acquired knowledge of the '910 Patent, Shining 3D has also contributorily infringed the '910 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the '910 Patent and are not staple articles suitable for substantial non-infringing use. For example, as discussed above, Shining 3D sells and distributes resin tray assemblies such as Shining 3D's HyperClear and Standard resin trays, components that form part of the assemblies and systems claimed in the Asserted Patents specifically for use with Shining 3D printers. Exhibit 13 (https://support.shining3ddental.com/en/support/solutions/articles/60001569623-resin-tank-versions-for-accufab-f1) at 1-2 (showing Shining 3D's Standard (FDAC1) and HyperClear (FDAC1 HyperClear) resin tanks); https://www.youtube.com/watch?v=o1huQoPjg1w (showing the CEL's standard resin tank); Exhibit 9 (https://www.shining3ddental.com/solution/accufab-cel) at 7 (showing that "the CEL supports a Hyper Clear resin tank").

199. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. When the Accused Products are used as intended, i.e., to 3D print an object, the Accused Products, including these build trays and dental materials, embody and are used as components of the apparatus of at least Claim 1, as described above. There is no way to use the Accused Products to 3D print without using the apparatus that infringes at least Claim 1, and the Accused Products have no purpose other than to 3D print. Thus,

Shining 3D has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components are especially made or adapted for use in infringing the ’910 Patent and are not staple articles suitable for substantial non-infringing use.

200. Shining 3D has knowingly and actively aided and abetted, encouraged, and contributed to its customers’, resellers’, and distributors’ direct infringement of the ’910 Patent. Such instructions and encouragement include, but is not limited to, advising third parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the ’910 Patent, and by advertising and promoting the use of the Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner.

201. Shining 3D’s indirect infringement of the ’910 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

202. Shining 3D’s indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

203. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Shining 3D’s indirect infringement.

**COUNT XIII**
**(Direct Infringement of the ’588 Patent)**

204. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

205. Shining 3D has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the ’588 Patent in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and importing into the United States the Accused Products without permission, consent, authorization, or license from SprintRay.

206. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the ’588 Patent. Claim 1 recites the following limitations:

> A substrate assembly for use with a three-dimensional printer reservoir, the reservoir including a frame defining a cavity adapted to be at least partially filled with a photosensitive liquid, the substrate assembly comprising:
>
> a first layer comprising a film adapted to be configured with a lower portion of the cavity and to hold the photosensitive liquid within the cavity above a projection lens of a stereolithography projector configured below the film;
>
> a second layer configured below the first layer; and
>
> a third layer comprising a semi-transparent substrate adapted to enhance a surface finish of a 3D-printed object held detachedly between the first layer and the second layer.

207. The Accused Products include the F1 and CEL with HyperClear resin trays, each of which includes a resin tank or reservoir assembly comprising a frame that defines a cavity adapted to be at least partially filled with photosensitive resin during printing. *See* https://www.youtube.com/watch?v=XSVhYLMv1zc, https://www.youtube.com/watch?v=0fkSqgVmHIQ (showing liquid photopolymer resin being poured into the cavity of a resin tank of the Accused Products).

208. The Accused Products further include a first layer comprising a film positioned at a lower portion of the reservoir cavity that retains the photosensitive liquid, including a permeable release film that holds the resin within the cavity while permitting exposure to light from a projection system positioned below the film.


First layer
FDAC1-BE007A02
Printing Removable Denture with AccuFab F1
SHINING3D Dental
9.4K subscribers
Subscribe
37
Share
Save


First layer
WARNING
MAX
MIN
Temporary CB Resin
LAC2-BD011K14

Accufab Cel

*See* https://www.youtube.com/watch?v=XSVhYLMv1zc, https://www.youtube.com/watch?v=0fkSqgVmHIQ (showing the first layer of permeable film in the resin tank forming a lower portion of the cavity and holding resin).




*See* https://www.youtube.com/watch?v=9Id-5AMVhG8 (showing how the DLP light engine, a projection system, is positioned below the entire substrate assembly, including the first layer).




Exhibit 10 (CEL User Manual) at 19 (showing the LED/LCD light system, a projection system, is positioned below the entire substrate assembly, including the first layer).

209. The Accused Products also include a second layer configured below the first layer, including a substrate positioned beneath the film, such as a glass or similar support structure forming part of the printing assembly. *See* https://www.youtube.com/watch?v=9Id-5AMVhG8, https://www.youtube.com/watch?v=lxYOzkUHPQY (showing the glass plate positioned beneath the build tray, which is the second layer supporting the film and forming part of the printing assembly).

210. The Accused Products further include a third, semi-transparent layer configured to diffuse light and enhance surface finish, such as the scattering film used in HyperClear and similar resin trays. *See* https://www.youtube.com/watch?v=v5CNmM-d8Ho (showing the HyperClear resin tank includes the third layer, a lower scattering film with four holes, allowing air into the gap between the two films, which would be disposed between the first and second layers).


SHINING 3D DENTAL
36,025 followers
6mo •
+ Follow ···

✨ Take a closer look at how the AccuFab-F1 prints with SH01, our resin designed for clear, durable, and patient-friendly splints

SH01 brings together performance and comfort:
🔹 High strength & flexibility - Creates resilient splints with dependable fracture resistance
🔹 Precision & longevity - Controlled shrinkage ensures a stable, accurate fit over time
🔹 Time-saving post-processing - The HyperClear system helps reduce polishing and streamline finishing
🔹 Biocompatible - A safe formulation free of TPO, MMA, and THF-MA - suitable even for sensitive patients

For splints that look good, feel comfortable, and stand up to everyday use.

Start printing smarter today.

#shining3ddental #accufabf1 #3dprinter #3dprinting #dentalprinting #digitaldentistry


SHINING 3D DENTAL
36,025 followers
4mo •
+ Follow ···

🦷 From intraoral scan to a chairside nightguard with a precise, rigid fit 🦷

⚙️ Bring nightguard production in-house and extend your digital workflow to efficient chairside fabrication. Splint One-Click Printing positions thicker appliances upright, with supports placed at the front, helping maintain accuracy while simplifying post-processing.

🧪 SH01, SHINING 3D Dental's self-developed hard splint resin, is engineered for rigid occlusal guards that deliver consistent fit and clinical reliability.

✨ When combined with the HyperClear system, SH01 achieves a highly polished surface and excellent clarity, enhancing both translucency and patient comfort.

💡 Predictable material usage and controlled costs make in-clinic nightguard production a practical solution for everyday practice.

Accurate. Rigid. Chairside-ready.
SH01 makes chairside nightguard production reliable and predictable.

#shining3ddental #digitaldentistry #chairsidedentistry #nightguard #occlusalguard #splintprinting #dental3dprinting #dentalmaterials #SH01

Exhibit 22 (https://www.linkedin.com/posts/shining3d-dental_shining3ddental-accufabf1-3dprinter-activity-7403078789003735040-kFZQ?utm_source=share&utm_medium=member_desktop&rcm=ACoAACjicRYBBlOwQrXH33inC3-jKqJaIispTE4) at 1 (showing how the Accused Products, using the HyperClear resin tank, enhance the surface finish of 3D printed objects); Exhibit 23 (https://www.linkedin.com/posts/shining3d-dental_shining3ddental-digitaldentistry-chairsidedentistry-activity-7423365148926672896-Z4J8?utm_source=share&utm_medium=member_desktop&rcm=ACoAACjicRYBBlOwQrXH33inC3-jKqJaIispTE4) at 1-2 (same).

211. Shining 3D's infringement of the '588 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

212. Shining 3D's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

213. Since at least receiving notice of the '588 Patent through service of this Complaint, Shining 3D has continued its infringing conduct with knowledge of the '588 Patent.

214. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Shining 3D's direct infringement of the '588 Patent.

**COUNT XIV**
**(Indirect Infringement of the '588 Patent)**

215. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

216. As set forth above, at least upon service of this Complaint, Shining 3D had knowledge of the '588 Patent and of its infringement thereof.

217. After acquiring knowledge of the '588 Patent, Shining 3D has actively, knowingly, and intentionally induced infringement of the '588 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers, distributors, and end users to meet the elements of at least Claim 1 of the '588 Patent. Such use is consistent with how the Accused Products are described to directly infringe the '588 Patent and how they are intended to be used, as described above and incorporated by reference here.

218. Shining 3D knew or was willfully blind to the fact that it was inducing others, including customers, authorized resellers, distributors, and end users, to infringe the '588 Patent, including at least Claim 1. Shining 3D's inducement includes, without limitation, providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products in an infringing manner. *See generally* Exhibit 17 (F1 User Manual)

(instructing others how to unpack, install, configure, and use the Accused Products), Exhibit 10 (CEL User Manual) (same), Exhibit 18 (F1 Brochure) (promoting and marketing the Accused Products), Exhibit 19 (CEL Brochure) (same); *see also* Exhibit 20 (https://www.shining3ddental.com/resource-center?search=&type=201389934202) at 1-2 (showing how Shining 3D operates a "Resource Center" providing case studies, webinars, blogs, and events for the Accused Products); Exhibit 21 (https://www.shining3ddental.com/blog/guide-to-buying-3d-dental-printers) at 5 (promoting and marketing the F1 to users, including features such as "advanced DLP light-curing technology," "a printing accuracy of ± 25μm," an "[o]pen [m]aterial [s]ystem," and that it is "designed specifically for dental clinics"); Exhibit 19 (CEL Brochure) at 2 (promoting and marketing the CEL to users as a "premium-level printing experience," including features such as improved printing speed and a high-performance light panel); https://www.youtube.com/watch?v=XSVhYLMv1zc (instructing and encouraging use of the F1 to print 3D-objects, including for dental use); https://www.youtube.com/watch?v=RCo92R9M7w4 (demonstrating and encouraging use of the CEL to print 3D-objects, including for dental use); https://www.youtube.com/watch?v=v5CNmM-d8Ho (instructing users how to clean and maintain the HyperClear resin tank to promote its infringing use to print 3D objects).

219. Beyond making the Accused Products and general product documentation available, Shining 3D affirmatively instructs, promotes, and encourages customers to operate the accused AccuFab-CEL printer together with the HyperClear resin tank in the configuration alleged to infringe the ’588 Patent. As alleged above, Shining 3D provides customers with AccuWare software and instructions for preparing, configuring, slicing, and initiating printing operations using the Accused Products. *See* Exhibit 32 (Download AccuWare, Shining 3D Dental Support Center). As further alleged above, Shining 3D expressly recommends operating the AccuFab-CEL printer with the HyperClear resin tank to fabricate dental splints and provides specific instructions for carrying out that printing workflow. *See* Exhibits 37, 38 (Splint Hard Resin Application Guide, Shining 3D Dental Support Center). These instructions include transferring the dental splint design into AccuWare, selecting the AccuFab-CEL printer, and initiating one-click printing, thereby directing customers to operate the particular printer-

and-tank configuration alleged to infringe the ’588 Patent. As further alleged above, Shining 3D also provides product-specific guidance concerning compatible resins and printing parameters for the accused printers. By directing customers to print using the AccuFab-CEL printer with the HyperClear resin tank, Shining 3D affirmatively encourages use of the accused resin reservoir assembly alleged to satisfy at least claim 1 of the ’588 Patent, including the first layer comprising a film retaining photosensitive resin, the second layer configured below the first layer, and the third layer comprising a semi-transparent substrate positioned between the first and second layers and configured to enhance the surface finish of the printed object, as identified in the direct-infringement allegations above. The structural characteristics of those layers are addressed in the preceding direct-infringement allegations; Shining 3D’s instructions encourage customers to use the accused configuration incorporating those components. On information and belief, after receiving actual notice of the ’588 Patent and the conduct alleged to infringe it, Shining 3D continued to provide and promote these instructions with knowledge of SprintRay’s infringement allegations and with the specific intent to encourage customers to engage in the acts of direct infringement alleged herein.

220. After having acquired knowledge of the ’588 Patent, Shining 3D has also contributorily infringed the ’588 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the ’588 Patent and are not staple articles suitable for substantial non-infringing use. For example, as discussed above, Shining 3D sells and distributes resin tray assemblies such as Shining 3D’s HyperClear resin trays, components that form part of the assemblies and systems claimed in the Asserted Patents specifically for use with Shining 3D printers. Exhibit 13 (https://support.shining3ddental.com/en/support/solutions/articles/60001569623-resin-tank-versions-for-accufab-f1) at 1-2 (showing Shining 3D’s Standard (FDAC1) and HyperClear (FDAC1 HyperClear) resin tanks); https://www.youtube.com/watch?v=o1huQoPjg1w (showing the CEL’s standard resin tank); Exhibit 9 (https://www.shining3ddental.com/solution/accufab-cel) at 7 (showing that “the CEL supports a Hyper Clear resin tank”).

221. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. When the Accused Products are used as intended, i.e., to 3D print an object, the Accused Products, including these build trays and dental materials, embody and are used as components of the apparatus of at least Claim 1, as described above. There is no way to use the Accused Products to 3D print without using the apparatus that infringes at least Claim 1, and the Accused Products have no purpose other than to 3D print. Thus, Shining 3D has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components are especially made or adapted for use in infringing the ’588 Patent and are not staple articles suitable for substantial non-infringing use.

222. Shining 3D has knowingly and actively aided and abetted, encouraged, and contributed to its customers’, resellers’, and distributors’ direct infringement of the ’588 Patent. Such instructions and encouragement include, but is not limited to, advising third parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the ’588 Patent, and by advertising and promoting the use of the Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner.

223. Shining 3D’s indirect infringement of the ’588 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

224. Shining 3D’s indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

225. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Shining 3D’s indirect infringement.

**COUNT XV**
**(Direct Infringement of the ’180 Patent)**

226. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

227. Shining 3D has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the ’180 Patent in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and importing into the United States the Accused Products without permission, consent, authorization, or license from SprintRay.

228. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the ’180 Patent. Claim 1 recites the following limitations:

> A reservoir assembly for use with a three-dimensional (3D) printer for printing a 3D object, comprising:
>
> > a frame defining a cavity adapted to be at least partially filled with a photosensitive liquid;
> >
> > a first layer comprising a film adapted to be configured with a lower portion of the cavity to hold the photosensitive liquid within the cavity, and adapted to align with a second layer configured below the first layer, the second layer optionally external to or integral with the reservoir assembly; and
> >
> > a third layer comprising a semi-transparent substrate adapted to enhance a surface finish of a 3D-printed object held without an adhesive between the first layer and the second layer.

229. The Accused Products include the F1 and CEL with HyperClear resin trays, each of which includes a reservoir assembly in which a resin tank defines a cavity configured to hold liquid photopolymer resin during printing. *See* https://www.youtube.com/watch?v=XSVhYLMv1zc, https://www.youtube.com/watch?v=0fkSqgVmHIQ (showing liquid photopolymer resin being poured into the cavity of a resin tank of a build tray).

230. The Accused Products further include a first layer comprising a film positioned to form a lower portion of the cavity and to retain the photosensitive liquid, such as the permeable release film used in the resin tank. *See* https://www.youtube.com/watch?v=XSVhYLMv1zc,

https://www.youtube.com/watch?v=0fkSqgVmHIQ (showing the first layer of permeable release film in the resin tank forming a lower portion of the cavity and holding resin).

231. The Accused Products also include a glass plate, which is a second layer aligned with and below the first layer. *See* https://www.youtube.com/watch?v=9Id-5AMVhG8, https://www.youtube.com/watch?v=lxYOzkUHPQY (showing the glass plate positioned beneath the build tray, which is the second layer supporting the film and forming part of the reservoir assembly).

232. In addition, the Accused Products include a third layer comprising a semi-transparent substrate disposed between the first and second layers configured to diffuse light and enhance the surface finish of printed objects, such as the diffusing film used in HyperClear and similar resin trays. *See* https://www.youtube.com/watch?v=v5CNmM-d8Ho (showing the HyperClear resin tank includes the third layer, a lower scattering film with four holes, allowing air into the gap between the two films, which would be disposed between the first and second layers); Exhibit 22 (https://www.linkedin.com/posts/shining3d-dental_shining3ddental-accufabf1-3dprinter-activity-7403078789003735040-kFZQ?utm_source=share&utm_medium=member_desktop&rcm=ACoAACjicRYBBlOwQrXH33inC3-jKqJaIispTE4) at 1 (showing how the Accused Products, using the HyperClear resin tank, enhance the surface finish of 3D printed objects); Exhibit 23 (https://www.linkedin.com/posts/shining3d-dental_shining3ddental-digitaldentistry-chairsidedentistry-activity-7423365148926672896-Z4J8?utm_source=share&utm_medium=member_desktop&rcm=ACoAACjicRYBBlOwQrXH33inC3-jKqJaIispTE4) at 1-2 (same).

233. Shining 3D's infringement of the '180 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

234. Shining 3D's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

235. Since at least receiving notice of the '180 Patent through service of this Complaint, Shining 3D has continued its infringing conduct with knowledge of the '180 Patent.

236. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Shining 3D's direct infringement of the '180 Patent.

**COUNT XVI**
**(Indirect Infringement of the '180 Patent)**

237. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

238. As set forth above, at least upon service of this Complaint, Shining 3D had knowledge of the '180 Patent and of its infringement thereof.

239. After acquiring knowledge of the '180 Patent, Shining 3D has actively, knowingly, and intentionally induced infringement of the '180 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers, distributors, and end users to meet the elements of at least Claim 1 of the '180 Patent. Such use is consistent with how the Accused Products are described to directly infringe the '180 Patent and how they are intended to be used, as described above and incorporated by reference here.

240. Shining 3D knew or was willfully blind to the fact that it was inducing others, including customers, authorized resellers, distributors, and end users, to infringe the '180 Patent, including at least Claim 1. Shining 3D's inducement includes, without limitation, providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products in an infringing manner. *See generally* Exhibit 17 (F1 User Manual) (instructing others how to unpack, install, configure, and use the Accused Products), Exhibit 10 (CEL User Manual) (same), Exhibit 18 (F1 Brochure) (promoting and marketing the Accused Products), Exhibit 19 (CEL Brochure) (same); *see also* Exhibit 20 (https://www.shining3ddental.com/resource-center?search=&type=201389934202) at 1-2 (showing how Shining 3D operates a "Resource Center" providing case studies, webinars, blogs, and events for the Accused Products); Exhibit 21 (https://www.shining3ddental.com/blog/guide-to-buying-3d-dental-printers) at 5 (promoting and marketing the F1 to users, including features such as "advanced DLP light-curing technology," "a

printing accuracy of ± 25μm," an "[o]pen [m]aterial [s]ystem," and that it is "designed specifically for dental clinics"); Exhibit 19 (CEL Brochure) at 2 (promoting and marketing the CEL to users as a "premium-level printing experience," including features such as improved printing speed and a high-performance light panel); https://www.youtube.com/watch?v=XSVhYLMv1zc (instructing and encouraging use of the F1 to print 3D-objects, including for dental use); https://www.youtube.com/watch?v=RCo92R9M7w4 (demonstrating and encouraging use of the CEL to print 3D-objects, including for dental use); https://www.youtube.com/watch?v=v5CNmM-d8Ho (instructing users how to clean and maintain the HyperClear resin tank to promote its infringing use to print 3D objects).

241. Beyond making the Accused Products and general product documentation available, Shining 3D affirmatively instructs, promotes, and encourages customers to operate the accused AccuFab-CEL printer together with the HyperClear resin tank in the configuration alleged to infringe the '180 Patent. As alleged above, Shining 3D provides customers with AccuWare software and instructions for preparing, configuring, slicing, and initiating printing operations using the Accused Products. *See* Exhibit 32 (Download AccuWare, Shining 3D Dental Support Center). As further alleged above, Shining 3D expressly recommends operating the AccuFab-CEL printer with the HyperClear resin tank to fabricate dental splints and provides specific instructions for carrying out that printing workflow. *See* Exhibits 37, 38 (Splint Hard Resin Application Guide, Shining 3D Dental Support Center). These instructions include transferring the dental splint design into AccuWare, selecting the AccuFab-CEL printer, and initiating one-click printing, thereby directing customers to operate the particular printer-and-tank configuration alleged to infringe the '180 Patent. By encouraging customers to print using the AccuFab-CEL printer with the HyperClear resin tank, Shining 3D affirmatively encourages use of the accused resin reservoir and substrate assembly alleged to satisfy at least claim 1 of the '180 Patent, including the first layer comprising a film retaining photosensitive resin, the second layer configured below the first layer, and the third layer comprising a semi-transparent substrate positioned between the first and second layers without adhesive contact and configured to enhance the surface finish of the printed object, as identified in the direct-infringement allegations above. The structural characteristics

and relationships of those layers are addressed in the preceding direct-infringement allegations; Shining 3D's instructions encourage customers to use the accused configuration incorporating those components. On information and belief, after receiving actual notice of the '180 Patent and the conduct alleged to infringe it, Shining 3D continued to provide and promote these instructions with knowledge of SprintRay's infringement allegations and with the specific intent to encourage customers to engage in the acts of direct infringement alleged herein.

242. After having acquired knowledge of the '180 Patent, Shining 3D has also contributorily infringed the '180 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the '180 Patent and are not staple articles suitable for substantial non-infringing use. For example, as discussed above, Shining 3D sells and distributes resin tray assemblies such as Shining 3D's HyperClear resin trays, components that form part of the assemblies and systems claimed in the Asserted Patents specifically for use with Shining 3D printers. Exhibit 13 (https://support.shining3ddental.com/en/support/solutions/articles/60001569623-resin-tank-versions-for-accufab-f1) at 1-2 (showing Shining 3D's Standard (FDAC1) and HyperClear (FDAC1 HyperClear) resin tanks); https://www.youtube.com/watch?v=o1huQoPjg1w (showing the CEL's standard resin tank); Exhibit 9 (https://www.shining3ddental.com/solution/accufab-cel) at 7 (showing that "the CEL supports a Hyper Clear resin tank").

243. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. When the Accused Products are used as intended, i.e., to 3D print an object, the Accused Products, including these build trays and dental materials, embody and are used as components of the apparatus of at least Claim 1, as described above. There is no way to use the Accused Products to 3D print without using the apparatus that infringes at least Claim 1, and the Accused Products have no purpose other than to 3D print. Thus, Shining 3D has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components

are especially made or adapted for use in infringing the ’180 Patent and are not staple articles suitable for substantial non-infringing use.

244. Shining 3D has knowingly and actively aided and abetted, encouraged, and contributed to its customers’, resellers’, and distributors’ direct infringement of the ’180 Patent. Such instructions and encouragement include, but is not limited to, advising third parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the ’180 Patent, and by advertising and promoting the use of the Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner.

245. Shining 3D’s indirect infringement of the ’180 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

246. Shining 3D’s indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

247. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Shining 3D’s indirect infringement.

## COUNT XVII
## (Direct Infringement of the ’224 Patent)

248. SprintRay repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

249. Shining 3D has infringed and continues to infringe, literally or under the doctrine of equivalents, one or more claims of the ’224 Patent in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, selling, and importing into the United States the Accused Products without permission, consent, authorization, or license from SprintRay.

250. By way of example, the Accused Products meet each and every limitation of at least Claim 1 of the ’224 Patent. Claim 1 recites the following limitations:

A reservoir assembly for use in three-dimensional printing, comprising:

a top frame having a cavity with an aperture defined on a bottom edge of the top frame, the cavity configured to be at least partially filled with a photosensitive liquid;

a permeable tensioned film stretchily coupled to the aperture so as to hold the photosensitive liquid within the cavity of the top frame;

a bottom frame including a transparent or semi-transparent rigid substrate, the bottom frame configured to register with the top frame; and

a media layer disposed between the permeable tensioned film and the rigid substrate of the bottom frame, the permeable tensioned film detached from and suspended above the media layer.

251. The Accused Products include the F1 and CEL with HyperClear resin trays, each of which includes a reservoir assembly for use in three-dimensional printing. *See* https://www.youtube.com/watch?v=XSVhYLMv1zc, https://www.youtube.com/watch?v=0fkSqgVmHIQ (showing liquid photopolymer resin being poured into the cavity of a resin tank of a build tray).

252. The Accused Products further include a top frame having a cavity with an aperture defined on a bottom edge of the top frame, the cavity configured to be at least partially filled with a photosensitive liquid. For example, the HyperClear resin tank comprises a top frame, with an aperture (hole) visible upon removal of the films disposed at the bottom of the tank, defined on a bottom edge of the resin tank, as shown below. The film layers stretchily coupled to the aperture of the top frame.




Film Changing for Standard Resin Tank For AccuFab-CEL

*See* https://www.youtube.com/watch?v=o1huQoPjg1w (showing the aperture defined on a bottom edge of the top frame by removing the films in the bottom of the resin tank).




*See* https://www.youtube.com/watch?v=v5CNmM-d8Ho (showing the HyperClear resin tank, removed from the reservoir assembly, has films attached to the bottom of the top frame, which can be removed to show the aperture defined on a bottom edge of the top frame).






**Accufab Cel**

*See* https://www.youtube.com/watch?v=XSVhYLMv1zc, https://www.youtube.com/watch?v=0fkSqgVmHIQ (showing cavity within the top frame partially filled with resin, a photosensitive liquid).

253. The Accused Products include a permeable tensioned film, for example, the permeable release film in the HyperClear resin tanks, stretchily coupled to the aperture so as to hold the

photosensitive liquid within the cavity of the top frame.




*See* https://www.youtube.com/watch?v=v5CNmM-d8Ho (showing the HyperClear resin tank which is the film assembly including a frame and a permeable release film tensioned across the bottom of the resin tank configured to hold photosensitive liquid during printing).

254. The Accused Products further include a bottom frame including a transparent or semi-transparent rigid substrate, a glass plate, configured to register with the resin tank (top frame) via grooves and clips.




AccuFab-F1 | High-Performance Dental 3D Printing Redefined




Platform Levelling for AccuFab-CEL

*See* https://www.youtube.com/watch?v=9Id-5AMVhG8, https://www.youtube.com/watch?v=lxYOzkUHPQY (showing the glass plate, which is a transparent or semi-transparent rigid substrate within a frame).






*See* https://www.youtube.com/watch?v=v5CNmM-d8Ho, https://www.youtube.com/watch?v=RCo92R9M7w4 (showing that the bottom frame including the glass plate is configured to register with the resin tank (top frame) via grooves in the bottom frame and clips to secure the resin tank to the bottom frame).

255. The Accused Products also include a scattering film layer in the HyperClear resin tank, which is a media layer disposed between the permeable tensioned film and the glass plate within the bottom frame. The permeable tensioned film is detached from and suspended above the diffusing film, the media layer, and separated by an air gap.






*See* https://www.youtube.com/watch?v=v5CNmM-d8Ho (showing the HyperClear resin tank includes a scattering film, a media layer, with four holes, allowing air into the gap between the permeable release film and the scattering film, demonstrating that the permeable tensioned film is detached from and suspended above the media layer).

256. Shining 3D's infringement of the '224 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

257. Shining 3D's acts of infringement have caused and are continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

258. Since at least receiving notice of the '224 Patent through service of this Complaint, Shining 3D has continued its infringing conduct with knowledge of the '224 Patent.

259. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Shining 3D's direct infringement of the '224 Patent.

**COUNT XVIII**
**(Indirect Infringement of the '224 Patent)**

260. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

261. As set forth above, at least upon service of this Complaint, Shining 3D had knowledge of the '224 Patent and of its infringement thereof.

262. After acquiring knowledge of the '224 Patent, Shining 3D has actively, knowingly, and intentionally induced infringement of the '224 Patent in violation of 35 U.S.C. § 271(b) by, among other things, instructing, encouraging, promoting and directing customers, authorized resellers, distributors, and end users to meet the elements of at least Claim 1 of the '224 Patent. Such use is consistent with how the Accused Products are described to directly infringe the '224 Patent and how they are intended to be used, as described above and incorporated by reference here.

263. Shining 3D knew or was willfully blind to the fact that it was inducing others, including customers, authorized resellers, distributors, and end users, to infringe the '224 Patent, including at least Claim 1. Shining 3D's inducement includes, without limitation, providing user manuals and technical documentation; offering training and customer support; publishing instructional videos and online content; promoting and marketing the Accused Products; and instructing customers and resellers how to use the Accused Products in an infringing manner. *See generally* Exhibit 17 (F1 User Manual) (instructing others how to unpack, install, configure, and use the Accused Products), Exhibit 10 (CEL User Manual) (same), Exhibit 18 (F1 Brochure) (promoting and marketing the Accused Products), Exhibit 19 (CEL Brochure) (same); *see also* Exhibit 20 (https://www.shining3ddental.com/resource-center?search=&type=201389934202) at 1-2 (showing how Shining 3D operates a "Resource Center" providing case studies, webinars, blogs, and events for the Accused Products); Exhibit 21 (https://www.shining3ddental.com/blog/guide-to-buying-3d-dental-printers) at 5 (promoting and marketing the F1 to users, including features such as "advanced DLP light-curing technology," "a

printing accuracy of ± 25µm," an "[o]pen [m]aterial [s]ystem," and that it is "designed specifically for dental clinics"); Exhibit 19 (CEL Brochure) at 2 (promoting and marketing the CEL to users as a "premium-level printing experience," including features such as improved printing speed and a high-performance light panel); https://www.youtube.com/watch?v=XSVhYLMv1zc (instructing and encouraging use of the F1 to print 3D-objects, including for dental use); https://www.youtube.com/watch?v=RCo92R9M7w4 (demonstrating and encouraging use of the CEL to print 3D-objects, including for dental use); https://www.youtube.com/watch?v=v5CNmM-d8Ho (instructing users how to clean and maintain the HyperClear resin tank to promote its infringing use to print 3D objects).

264. Beyond making the Accused Products and general product documentation available, Shining 3D affirmatively instructs, promotes, and encourages customers to operate the accused AccuFab-CEL printer together with the HyperClear resin tank in the configuration alleged to infringe the '224 Patent. As alleged above, Shining 3D provides customers with AccuWare software and instructions for preparing, configuring, slicing, and initiating printing operations using the Accused Products. *See* Exhibit 32 (Download AccuWare, Shining 3D Dental Support Center). As further alleged above, Shining 3D expressly recommends operating the AccuFab-CEL printer with the HyperClear resin tank to fabricate dental splints and provides specific instructions for carrying out that printing workflow. *See* Exhibits 37, 38 (Splint Hard Resin Application Guide, Shining 3D Dental Support Center). These instructions include transferring the dental splint design into AccuWare, selecting the AccuFab-CEL printer, and initiating one-click printing, thereby directing customers to operate the particular printer-and-tank configuration alleged to infringe the '224 Patent. By encouraging customers to print using the AccuFab-CEL printer with the HyperClear resin tank, Shining 3D affirmatively encourages use of the accused resin reservoir and substrate assembly alleged to satisfy at least claim 1 of the '224 Patent, including the first layer comprising a film retaining photosensitive resin, the second layer configured below the first layer, and the third layer comprising a semi-transparent substrate positioned between the first and second layers without adhesive contact and configured to enhance the surface finish of the printed object, as identified in the direct-infringement

allegations above. The structural characteristics and relationships of those layers are addressed in the preceding direct-infringement allegations; Shining 3D's instructions encourage customers to use the accused configuration incorporating those components. On information and belief, after receiving actual notice of the '224 Patent and the conduct alleged to infringe it, Shining 3D continued to provide and promote these instructions with knowledge of SprintRay's infringement allegations and with the specific intent to encourage customers to engage in the acts of direct infringement alleged herein.

265. After having acquired knowledge of the '224 Patent, Shining 3D has also contributorily infringed the '224 Patent in violation of 35 U.S.C. § 271(c) by offering to sell, selling, and importing components of the Accused Products that constitute material parts of the claimed inventions, knowing that such components are especially made or adapted for use in infringing the '224 Patent and are not staple articles suitable for substantial non-infringing use. For example, as discussed above, Shining 3D sells and distributes resin tray assemblies such as Shining 3D's HyperClear resin trays, components that form part of the assemblies and systems claimed in the Asserted Patents specifically for use with Shining 3D printers. Exhibit 13 (https://support.shining3ddental.com/en/support/solutions/articles/60001569623-resin-tank-versions-for-accufab-f1) at 1-2 (showing Shining 3D's Standard (FDAC1) and HyperClear (FDAC1 HyperClear) resin tanks); https://www.youtube.com/watch?v=o1huQoPjg1w (showing the CEL's standard resin tank); Exhibit 9 (https://www.shining3ddental.com/solution/accufab-cel) at 7 (showing that "the CEL supports a Hyper Clear resin tank").

266. These components are not suitable for substantial non-infringing use because they are specifically designed and sold for use as part of the Accused Products. When the Accused Products are used as intended, i.e., to 3D print an object, the Accused Products, including these build trays and dental materials, embody and are used as components of the apparatus of at least Claim 1, as described above. There is no way to use the Accused Products to 3D print without using the apparatus that infringes at least Claim 1, and the Accused Products have no purpose other than to 3D print. Thus, Shining 3D has contributorily infringed by selling and importing these components of the Accused Products that constitute material parts of the claimed inventions, with knowledge that such components

are especially made or adapted for use in infringing the ’224 Patent and are not staple articles suitable for substantial non-infringing use.

267. Shining 3D has knowingly and actively aided and abetted, encouraged, and contributed to its customers’, resellers’, and distributors’ direct infringement of the ’224 Patent. Such instructions and encouragement include, but is not limited to, advising third parties to use the Accused Products in an infringing manner, providing the Accused Products through which third parties may infringe the ’224 Patent, and by advertising and promoting the use of the Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the Accused Products in an infringing manner.

268. Shining 3D’s indirect infringement of the ’224 Patent has injured and continues to injure SprintRay in an amount to be proven at trial, but not less than a reasonable royalty.

269. Shining 3D’s indirect infringement has caused and is continuing to cause damage and irreparable injury to SprintRay, and SprintRay will continue to suffer damage and irreparable injury unless and until such infringement is enjoined by this Court.

270. SprintRay is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for Shining 3D’s indirect infringement.

## COUNT XIX
## (False Advertising in Violation of 15 U.S.C. § 1125(a)(1)(B))

271. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

272. Shining 3D has violated and continues to violate 15 U.S.C. § 1125(a)(1)(B), and has harmed and continues to harm SprintRay by falsely and misleadingly representing in commercial advertising and promotion that the Ceramix Nano has received the Federal Communications Commission (“FCC”) approvals necessary for lawful commercial marketing, sale, and operation in the United States when, in fact, Shining 3D has marketed and sold the Ceramix Nano before obtaining all of the FCC equipment authorizations required for the device.

273. SprintRay and Shining 3D at the relevant times are direct competitors in the United States market for dental 3D printers, including in this District. The Ceramix Nano is a composite radio-

frequency device governed by Part 15 of the FCC Rules because, within a single product, it functions as both an intentional radiator and an unintentional radiator as defined in 47 C.F.R. § 15.3. The device includes a Wi-Fi transmitter that intentionally generates and emits radio-frequency energy through radiation, making it an intentional radiator. It also contains digital electronics, including processors, a display, clock and timing circuits, a switching power supply, and motor-control electronics, all of which generate and use radio-frequency energy within the device.

274. FCC regulations prohibit the marketing of a radio-frequency device, including its sale, offering for sale, advertising, importation, shipment, or distribution, unless the device has obtained all required equipment authorizations for both its intentional-radiator and unintentional-radiator functions. 47 C.F.R. § 2.909(a)-(c); 47 C.F.R. § 2.803(b). The FCC requires radio-frequency devices to obtain authorization before marketing to prevent potentially noncompliant devices from entering commerce and causing harmful interference to other electronic and wireless systems.

275. To satisfy the FCC's equipment-authorization requirements for its intentional radiator, Shining 3D was required to obtain FCC certification for the Ceramix Nano's Wi-Fi transmitter before marketing the device. 47 C.F.R. § 15.201. A certification is an FCC equipment authorization issued after an FCC-recognized Telecommunication Certification Body ("TCB") reviews the device's test data and issues a grant of certification authorizing the device to be marketed. 47 C.F.R. §§ 2.907, 2.960.

276. To satisfy the FCC's equipment-authorization requirements for its unintentional radiator, Shining was required to obtain authorization for the Ceramix Nano's digital-device functions through either certification or a Supplier's Declaration of Conformity ("SDoC") before marketing the device. 47 C.F.R. § 15.101.

277. A Supplier's Declaration of Conformity is an FCC equipment-authorization procedure under which the responsible party determines that the device complies with the applicable technical standards and maintains records demonstrating such compliance. 47 C.F.R. § 2.906.

278. An FCC identifier ("FCC ID") and a representation that a device complies with Part 15 of the FCC Rules communicate to reasonable purchasers that the Ceramix Nano has obtained the FCC

authorizations required for lawful marketing, sale, and operation in the United States, including any certification required for its intentional radiator functions and the authorization required for its unintentional radiator, whether by certification or an SDoC. *See* 47 C.F.R. § 2.925.

279. On or about June 18, 2026, Shining 3D conducted an official global launch of the Ceramix Nano and began offering the device for sale in the United States, including in this District. Exhibit 29 (https://www.shining3ddental.com/news-post/shining-3d-dental-launches-ceramix-nano-capsule-3d-printer-10-minute-permanent-ceramic-crowns-chairside); Exhibit 44 (https://www.sodiumdental.com/shining-3d-ceramix-nano-announcement/).

280. SprintRay purchased a United States-market Ceramix Nano on or about June 19, 2026 and took delivery on or about June 26, 2026. The unit bore the FCC mark, the FCC ID (2AMG4-NANO), and the statement that "This device complies with Part 15 of the FCC Rules."

281. At the time Shining 3D first marketed and sold the Ceramix Nano in the United States, the device had not yet received all FCC equipment authorizations required for lawful marketing and sale. The FCC did not issue grants of certification under FCC ID 2AMG4-NANO until August 1, 2026, when it issued separate grants for the device's 2.4 GHz and 5 GHz transmitters. Exhibit 45 (2.4 GHz Grant of Authorization), Exhibit 46 (5 GHz Grant of Authorization). The compliance testing on which Shining 3D's certification application relies was not documented until the requisite test reports issued on June 30, 2026, after at least the unit SprintRay purchased had already been sold and delivered.

282. Accordingly, when Shining 3D marketed and sold the Ceramix Nano bearing an FCC ID and the statement that the device "complies with Part 15 of the FCC Rules," those representations communicated to reasonable purchasers that the device had already received the FCC authorization necessary for lawful commercial marketing and sale in the United States, when in fact the required certifications had not yet been granted.

283. Additionally, as discussed above, the Ceramix Nano's unintentional-radiator and digital-device functions required Shining 3D, before marketing, either to obtain certification or to complete a Supplier's Declaration of Conformity ("SDoC") supported by measurements demonstrating compliance

with the applicable technical standards. 47 C.F.R. §§ 15.101, 2.906. The FCC grants issued on August 1, 2026 were limited to the Ceramix Nano's 2.4 GHz and 5 GHz transmitters. Those grants did not purport to authorize the Ceramix Nano's unintentional-radiator or digital-device functions. 47 C.F.R. § 2.909.

284. Upon information and belief, Shining 3D has still not obtained the requisite equipment authorization for the device's unintentional-radiator and digital-device functions through an SDoC. That inference is supported by, among other things, (a) the absence of any grant, declaration, or other public record reflecting authorization of the Ceramix Nano's unintentional-radiator and digital-device functions; (b) the fact that the only known FCC equipment authorizations obtained by Shining 3D are the two transmitter certifications issued on August 1, 2026; and (c) the timing of Shining 3D's compliance testing, which was not documented until June 30, 2026, after the device was already being marketed and sold in the United States.

285. On information and belief, Shining 3D continues to market, advertise, offer for sale, sell, ship, and deliver the Ceramix Nano in the U.S. bearing the FCC ID and the affirmative Part 15 compliance statement, even though it has not completed an SDoC required for the device's unintentional radiator or otherwise obtained the authorization required for those functions. Shining 3D's representation that the Ceramix Nano complies with Part 15 and has received the FCC approvals necessary for lawful marketing and sale in the United States therefore remains false and misleading, and its false and misleading conduct is ongoing and continuing.

286. Shining 3D knew, and continues to know, that the Ceramix Nano has not received all required FCC authorizations while marking, marketing, advertising, and selling the device as FCC-compliant. As the manufacturer, the applicant for certification, and the party responsible for the device's FCC compliance, Shining 3D alone controlled the timing of its testing, certification applications, and any SDoC, and knew and knows whether the required certifications had been granted and whether a compliant SDoC had been completed.

287. Shining 3D made and continues to make false or misleading statements of fact in commercial advertising and promotion concerning the Ceramix Nano by publicly launching,

marketing, offering for sale, selling, and delivering the Ceramix Nano while displaying FCC ID 2AMG4-NANO and an affirmative Part 15 compliance statement, even though the device has not received all of the FCC equipment authorizations necessary for lawful marketing and sale in the United States, including both the certification required for its intentional-radiator functions and the authorization required for its unintentional-radiator functions.

288. Shining 3D's false and misleading representations actually deceive, or at a minimum have a tendency to deceive, a substantial segment of the intended audience, including dental professionals and other purchasers who reasonably understand the FCC ID, Part 15 compliance statement, and related FCC representations to indicate that the Ceramix Nano has received the FCC authorization required for commercial sale and operation in the United States.

289. Shining 3D's false and misleading representations are material because FCC authorization is a legal prerequisite to the commercial marketing and operation of a radio-frequency device in the United States, and purchasers of professional dental equipment consider regulatory authorization important when making purchasing decisions. The representations further convey that Shining 3D has satisfied regulatory requirements applicable to competing products, thereby conferring an appearance of regulatory legitimacy and compliance.

290. Shining 3D disseminates its false and misleading representations in interstate commerce by marketing, advertising, offering for sale, selling, shipping, and delivering the Ceramix Nano in the United States bearing FCC ID 2AMG4-NANO and the Part 15 compliance statement before all FCC equipment authorizations have been granted.

291. As a direct competitor, SprintRay is injured and continues to suffer injury as a result of Shining 3D's false and misleading representations, including through diversion of sales, loss of market share, injury to goodwill and reputation, and the unfair competitive advantage Shining 3D obtains by commercially marketing and selling the Ceramix Nano while representing that it has satisfied FCC authorization requirements that SprintRay and other competitors are required to satisfy before commercialization. Unless enjoined, Shining 3D's conduct will continue to cause SprintRay irreparable harm for which there is no adequate remedy at law.

292. Shining 3D's conduct was willful and deliberate, rendering this an exceptional case and entitling SprintRay to an accounting and disgorgement of Shining 3D's profits, SprintRay's damages, up to three times its actual damages and such enhancement or adjustment of the profits award as the Court finds just, the costs of corrective advertising, costs, and reasonable attorneys' fees under 15 U.S.C. § 1117(a), destruction and recall of the offending materials under 15 U.S.C. § 1118, pre- and post-judgment interest, and injunctive relief pursuant to 15 U.S.C. § 1116.

**COUNT XX**
**(Unfair Competition in Violation of Cal. Bus. & Prof. Code § 17200 *et seq.*)**

293. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

294. Shining 3D's marketing, importation, offering for sale, and sale of the Ceramix Nano bearing an FCC ID and a representation that it complies with Part 15 before obtaining the FCC certification required for the device's intentional radiator, and, upon information and belief, without obtaining the authorization required for the device's unintentional-radiator and digital-device functions, violated, and continues to violate, the federal prohibition on marketing an unauthorized radio-frequency device, 47 U.S.C. § 302(a) and 47 C.F.R. § 2.803, constituting unlawful business acts and practices independently actionable under Cal. Bus. & Prof. Code § 17200.

295. Shining 3D's conduct was and is unfair because Shining 3D commercially launched, marketed, sold, and delivered the Ceramix Nano before obtaining FCC equipment authorization and, upon information and belief, continues to market and sell the device without having obtained authorization for its unintentional-radiator and digital-device functions, thereby securing an artificial competitive advantage over competitors that incurred the time, expense, and delay associated with obtaining FCC authorization before commercialization.

296. As a result, Shining 3D was and is able to compete against SprintRay and other market participants on terms not available to companies that complied with the FCC's equipment-authorization requirements, causing substantial harm to competition and competitive injury to SprintRay.

297. Shining 3D's representations that the Ceramix Nano was FCC-authorized and complied with Part 15 were and remain likely to deceive a substantial segment of reasonable purchasers into believing that the Ceramix Nano had received the FCC approvals necessary for lawful commercial sale and operation in the United States when it had not.

298. As a direct and proximate result of Shining 3D's unlawful, unfair, and fraudulent business acts and practices, SprintRay has suffered injury in fact and lost money or property, including lost sales, lost market share, diminished goodwill, and other competitive injury, and therefore has standing under Cal. Bus. & Prof. Code § 17204.

299. Unless restrained by this Court, Shining 3D's unlawful, unfair, and fraudulent business acts and practices will continue to cause irreparable harm to SprintRay and the consuming public. SprintRay is therefore entitled to injunctive relief pursuant to Cal. Bus. & Prof. Code § 17203 and such other equitable relief as the Court deems appropriate.

**COUNT XXI**
**(False Advertising in Violation of Cal. Bus. & Prof. Code § 17500)**

300. SprintRay repeats, realleges, and incorporates by reference, the allegations of the preceding paragraphs as if fully set forth herein.

301. Shining 3D's marketing, advertising, offering for sale, sale, and distribution of the Ceramix Nano while representing that the device was FCC-authorized, bore FCC ID 2AMG4-NANO, and complied with Part 15 of the FCC Rules, before any FCC equipment authorization had been granted for its intentional radiator and, on information and belief, while its unintentional-radiator and digital-device functions remained unauthorized, constituted, and continues to constitute, untrue or misleading statements made to induce members of the public to purchase the Ceramix Nano, in violation of Cal. Bus. & Prof. Code § 17500.

302. Shining 3D's representations that the Ceramix Nano was and is FCC-authorized and complied with Part 15 of the FCC Rules were, and remain, untrue or misleading statements of fact made in connection with, and for the purpose of, selling the Ceramix Nano to the public in the United States.

303. The representations were, and remain, untrue or misleading because the FCC had not authorized the Ceramix Nano's intentional-radiator functions when Shining 3D marked, marketed, sold, and delivered the device prior to August 1, 2026, and because, on information and belief, Shining 3D still has not obtained the equipment authorization required for the device's unintentional-radiator and digital-device functions. The representations were and are likely to deceive reasonable members of the public.

304. Shining 3D knew, and continues to know, or in the exercise of reasonable care should have known and should know, that the representations were and are untrue or misleading because, as the manufacturer and the party responsible for the device's FCC compliance, it controlled and controls the timing of its testing and authorization activities and knew and knows whether the required FCC authorizations had issued when the representations were made and continue to be made.

305. Shining 3D's untrue and misleading representations conveyed, and continue to convey, that the Ceramix Nano satisfied applicable FCC authorization requirements and was lawfully available for commercial sale and operation in the United States, thereby increasing the attractiveness of the Ceramix Nano to prospective purchasers and diverting sales from SprintRay.

306. As a direct and proximate result of Shining 3D's conduct, SprintRay suffered, and continues to suffer, injury in fact and lost money or property, including lost sales, lost market share, diminished goodwill, and other competitive injury, and therefore has standing under California Business and Professions Code §§ 17204.

307. SprintRay is entitled to injunctive relief, restitution, and such other equitable relief as the Court deems appropriate pursuant to California Business and Professions Code §§ 17203 and 17535.

## PRAYER FOR RELIEF

WHEREFORE, SprintRay prays for judgment and relief as follows:

A. An entry of judgment holding that Shining 3D has infringed and is infringing each of the Asserted Patents;

B. An entry of judgment holding that Shining 3D has induced infringement and is inducing infringement of each of the Asserted Patents; and has contributorily infringed and continues to contributorily infringe each of the Asserted Patents;

C. A preliminary and permanent injunction against Shining 3D and its officers, employees, agents, servants, attorneys, instrumentalities, and those in privity with them, from infringing, inducing, and contributing to the infringement of each of the Asserted Patents and for all further and proper injunctive relief pursuant to 35 U.S.C. § 283;

D. An award to SprintRay of such damages as it shall prove at trial against Shining 3D to compensate SprintRay for Shining 3D's infringement of each of the Asserted Patents that will account for infringement up to trial based on the relevant information and financials produced, where said damages will be no less than a reasonable royalty;

E. An entry of judgment holding that Shining 3D's infringement of the Asserted Patents has been willful and deliberate, at least from the filing of the original Complaint;

F. A finding that this case is "exceptional" and an award to SprintRay of its costs and reasonable attorneys' fees, as provided by 35 U.S.C. § 285;

G. An accounting of all infringing sales and revenues, together with post judgment interest and prejudgment interest from the first date of infringement of each of the Asserted Patents;

H. An entry of judgment holding that Shining 3D engaged in false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and engaged in unlawful, unfair, and fraudulent business acts and practices and false advertising in violation of California Business and Professions Code §§ 17200 and 17500;

I. An award to SprintRay of Shining 3D's profits and SprintRay's damages arising from Shining 3D's false advertising, together with such enhancement or adjustment of those awards as the

Court finds just pursuant to 15 U.S.C. § 1117(a), including trebling of SprintRay's actual damages to the extent permitted by law;

J. An award to SprintRay of the costs of corrective advertising necessary to dispel the effects of Shining 3D's false and misleading representations;

K. An order under 15 U.S.C. § 1118 requiring the delivery up and destruction of all labels, packaging, advertising, promotional materials, and other materials in Shining 3D's possession, custody, or control bearing or disseminating the false FCC-related representations alleged herein;

L. An order granting restitution and such other equitable relief as may be available under California Business and Professions Code §§ 17203 and 17535;

M. A finding that this is an exceptional case and an award to SprintRay of its reasonable attorneys' fees under 15 U.S.C. § 1117(a), together with its costs, pre-judgment interest, and post-judgment interest; and

N. Such further and other relief as the Court may deem proper and just.

**JURY DEMAND**

SprintRay demands a jury trial on all issues so triable.

Respectfully Submitted,

Dated: November 2, 2026

By: */s/ Lisa Kobialka*
Lisa Kobialka (SBN 191404)
lisa.kobialka@brownrudnick.com
Christina M. Finn (SBN 247838)
christina.finn@brownrudnick.com
BROWN RUDNICK LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Tel.: (669) 469-1800

Aaron M. Frankel (*pro hac vice* to be filed)
aaron.frankel@brownrudnick.com
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Tel.: (212) 209-4800

*Attorneys for Plaintiff*
SprintRay, Inc.